## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| THE PREMCOR REFINING GROUP INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:17-cv-738 |
| | ) | |
| APEX OIL COMPANY, INC., | ) | |
| ATLANTIC RICHFIELD COMPANY, ARCO | ) | |
| PIPELINE COMPANY, BP PRODUCTS | ) | |
| NORTH AMERICA INC., BP PIPELINES | ) | |
| (NORTH AMERICA) INC., BUCKEYE | ) | |
| PARTNERS LLC, BUCKEYE | ) | |
| PIPE LINE COMPANY, KOCH | ) | |
| PIPELINE COMPANY, KOCH | ) | |
| INDUSTRIES INC., MARATHON | ) | |
| PIPE LINE LLC, SHELL OIL PRODUCTS | ) | |
| US, EQUILON ENTERPRISES, LLC, | ) | |
| SINCLAIR OIL CORPORATION. | ) | |
| | ) | |
| Defendants. | ) | |

## <u>COMPLAINT</u>

NOW COMES Plaintiff, THE PREMCOR REFINING GROUP INC. ("Premcor" or "Plaintiff"), by and through its undersigned attorneys, and for its claims against Defendants APEX OIL COMPANY, INC. ("Apex"), ATLANTIC RICHFIELD COMPANY (also known as "Old Sinclair"), ARCO PIPELINE COMPANY  ("ARCO"), BP PRODUCTS NORTH AMERICA, INC., f/k/a Amoco Oil Company, f/k/a Standard Oil of Indiana ("BP/Amoco"), BP PIPELINES (NORTH AMERICA), INC. ("BP Pipelines") (collectively the "BP Entities"), BUCKEYE PARTNERS LLC, BUCKEYE PIPE LINE COMPANY (collectively "Buckeye"), KOCH PIPELINE COMPANY LP, KOCH INDUSTRIES INC. f/k/a Wood River Oil & Refining Co., Inc. (collectively "Koch"), MARATHON PIPE LINE LLC ("Marathon"), SHELL OIL PRODUCTS US, EQUILON ENTERPRISES, LLC, (collectively "Shell"), SINCLAIR OIL

CORPORATION f/k/a Sinclair Refining Company ("New Sinclair") (collectively "Defendants"), states as follows:

**INTRODUCTION**

1.    Operations at a new crude oil refinery in Hartford, Illinois ("Refinery") began in 1941. Throughout the history of operations at the Refinery, Defendants have caused and/or contributed to the release of hazardous substances, contaminants, and/or other regulated toxic substances at and around the Refinery, which hazardous substances have remained at the Refinery as well as migrated off the Refinery property, including to and under the Village of Hartford. Plaintiff, Premcor Refining Group, Inc., has undertaken a series of actions to address the release or threatened release of hazardous substances at and around the Refinery and as a result, has incurred and continues to incur response costs related to those actions.  Based on the results of investigations, data, analysis, and information compiled by Premcor as detailed herein, each of the Defendants is liable to Premcor under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601-9675 for past and future response costs incurred by Premcor associated with addressing the hazardous substances at and around the Refinery.

**JURISDICTION**

2.    The Court has jurisdiction over Plaintiff's First and Second Claims for Relief pursuant to 28 U.S.C. § 1331 and section 113(b) of CERCLA, 42 U.S.C. § 9613(b).

**VENUE**

3.    This action involves properties located at or near 201 E. Hawthorne St., Hartford, Illinois, 62048 in the Village of Hartford, Illinois.

4.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C. §§ 9607 & 9613(b) because the Refinery is located within this District and because the acts that give rise to Plaintiff's claims occurred in this District.

## PARTIES

5.      Plaintiff, The Premcor Refining Group Inc., is a corporation organized under the laws of the State of Delaware and is qualified to do business in the State of Illinois.

6.      Plaintiff is informed and believes, and on that basis alleges, that defendant Apex is a corporation organized under the laws of the State of Missouri and is qualified to do business in the State of Illinois.

7.      Plaintiff is informed and believes, and on that basis alleges, that defendant Atlantic Richfield Company ("Old Sinclair") is a corporation organized under the laws of the State of Delaware with its principal place of business in Los Angeles, California, and that defendant ARCO Pipeline is a wholly owned subsidiary of Atlantic Richfield Company.

8.      Plaintiff is informed and believes, and on that basis alleges, that defendant BP/Amoco is a corporation organized under the laws of the State of Maryland with its principal place of business in Chicago, Illinois.

9.      Plaintiff is informed and believes, and on that basis alleges, that defendant BP Pipelines (North America), Inc., is a corporation organized under the laws of the State of Maine and qualified to do business in the State of Illinois.

10.      Plaintiff is informed and believes, and on that basis alleges, that defendant Buckeye is a corporation organized to do business outside of Illinois and qualified to do business in the State of Illinois and that defendant Buckeye Pipe Line is a wholly-owned subsidiary or operating company of Buckeye qualified to do business in Illinois.

11.     Plaintiff is informed and believes, and on that basis alleges, that defendant Koch Industries is a corporation organized under the laws of the State of Kansas with its principal place of business in Wichita, Kansas.

12.     Plaintiff is informed and believes, and on that basis alleges, that defendant Koch Pipeline is a former corporation organized under the laws of the State of Delaware and qualified to do business in the State of Illinois.

13.     Plaintiff is informed and believes, and on that basis alleges, that defendant Marathon is a corporation organized under the laws of the State of Delaware with its principal place of business in Findlay, Ohio.

14.     Plaintiff is informed and believes, and on that basis alleges, that defendant Shell is a corporation organized under the laws of the State of Delaware and qualified to do business in the State of Illinois.

15.     Plaintiff is informed and believes, and on that basis alleges, that defendant Equilon is a corporation organized under the laws of the State of Delaware and qualified to do business in the State of Illinois.

16.     Plaintiff is informed and believes, and on that basis alleges, that defendant New Sinclair is a corporation organized under the laws of the State of Wyoming with its principal place of business in Utah.

## GENERAL ALLEGATIONS

### A.     OVERVIEW OF THE HARTFORD REFINERY

17.     The Refinery is a large, industrial complex that consists, *inter alia,* of numerous buildings, tanks, pits, lagoons and pipelines located on three separate parcels of land that total approximately 400 acres. Two parcels are located on the east side of the Village of Hartford,

Illinois and are divided (north and south) by Hawthorne Street. A map of the Refinery and surrounding area is attached hereto as Exhibit A. The integrated Refinery complex is a single "facility" as defined under CERCLA, 42 U.S.C. § 9601(9).

18.     The north parcel covers an area of approximately 205 acres and is covered by aboveground storage tanks ("ASTs") and refinery equipment. The south parcel covers an area of approximately 65 acres and, currently, is covered by ASTs and associated piping and pipelines.

19.     The Refinery's third parcel is west of the Village between the United States Army Corps of Engineers flood control levee and the Mississippi River ("River Dock"). This parcel covers approximately 130 acres and was developed with large surface impoundments, landfills, lagoons, ponds, and/or waste pits into which wastes from Refinery operations were disposed from approximately 1955 to 1987.

20.     The integrated Refinery facility includes a barge loading and unloading dock, which connects the River Dock area to other Parts of the Refinery via pipelines. These pipelines run both above and below ground and run from the dock, through the River Dock area, to the levee, and then to and through other portions of the Refinery facility.

**B.     OWNERSHIP AND OPERATIONAL HISTORY OF FACILITIES AT OR NEAR THE REFINERY**

       **i.     The Refinery**

21.     Koch constructed the Refinery in 1940, and owned and/or operated it from 1940 to 1950. Koch also owned and/or operated pipelines that traversed or were in the vicinity of the Refinery after it sold the Refinery.

22.     "Old Sinclair," which eventually became Atlantic Richfield Co., bought the Refinery from Koch in 1950.  Old Sinclair owned and operated the Refinery until 1967. The BP

Entities are the successor in interest and liability to Old Sinclair/Atlantic Richfield Co.

Collectively, Atlantic Richfield and its successors will be referred to as "Old Sinclair/BP."

23.     On or around September 29, 1967, Old Sinclair sold the Refinery to Clark Oil and

Refining Corporation, a Wisconsin corporation ("Old Clark").

24.     Apex acquired the Refinery in 1981 when it acquired Clark Oil and Refining

Corporation, a Wisconsin corporation ("Clark Wisconsin"), which was the successor to Old

Clark, who had owned the Refinery since 1967. Apex is the successor in interest and liability to

Clark Wisconsin and Clark Oil & Refining Corporation.  Collectively, they will be referred to as

"Old Clark/Apex." Old Clark/Apex owned and operated the Refinery from 1967 to 1988.

25.     In 1988, Apex sold the Refinery to Premcor as part of its reorganization in

bankruptcy. At the time of the sale, Premcor was known as AOC Acquisition Company and

thereafter changed its name to Clark Oil & Refining Corporation, a Delaware corporation, and

then to Clark Refining and Marketing, Inc., and then to its present name.

### ii.     Nearby Pipeline Facilities

26.     Numerous pipelines owned and/or operated by defendants Buckeye, Koch,

Marathon, Shell, ARCO, and New Sinclair traverse and are in the vicinity of the Refinery and/or

connect the Refinery to nearby properties and/or facilities.

27.     Upon information and belief, Buckeye owns and/or operates pipelines that

traverse and are in the vicinity of the Refinery from approximately 2004 to the present.

28.     Upon information and belief, Koch Pipeline owns and/or operates pipelines that

traverse and are in the vicinity of the Refinery from approximately 2006 to the present.

29.     Marathon owns and has owned and/or has operated various pipelines that traverse

and are in the vicinity of the Refinery. Upon information and belief, Marathon's ownership

and/or operation of these pipelines spanned from on or about 1947 to the present. Upon information and belief, Marathon is the successor in interest and liability to Ohio Oil Company, which also owned and/or operated pipelines that traversed and are in the vicinity of the Refinery.

30.     Upon information and belief, Shell owned and/or operated pipelines that traverse and are in the vicinity of the Refinery from at least the mid 1940's until at least 2006.

31.     Upon information and belief, ARCO operated a pipeline from approximately 1979 to 1984 along Olive Street and that crossed and was adjacent to the Refinery and connected to the BP/Amoco Refinery to the north. The BP Entities are also the entities that owned and operated the BP/Amoco Refinery to the north of the Refinery. Additionally, upon information and belief, the BP Entities are the successor in liability to Standard Oil Company, which also owned and/or operated pipelines that traversed and are in the vicinity of the Refinery.

32.     New Sinclair has owned and/or operated pipelines that traverse and are in the vicinity of the Refinery. Specifically, New Sinclair owned and/or operated a 10-inch pipeline from approximately 1979 to 1984 along Olive Street and that crossed and was adjacent to the Refinery and connected to the BP/Amoco Refinery to the north.

### iii.     Adjacent Facilities Neighboring the Refinery

33.     Roxana Petroleum Company constructed a refinery located east/northeast of the Refinery in approximately 1918.  In 1928, Roxana changed its name to Shell Petroleum Corporation and in 1939, changed its name to Shell Oil Company, Inc.  In 1949 the company adopted the name Shell Oil Company ("Shell Refinery").  Upon information and belief, Equilon Enterprises became a successor in interest and liability to Shell and the Shell Refinery in 1998.

34.     To the north of the Refinery is the property that was once part of the historic operations of the White Star Refinery.  In or about September 1936, Shell purchased and began

7

to operate 22 acres of land and all tanks and other personal property located thereon north and

east of the refinery ("North Shell Property"), all part of the former White Star Refinery. Upon

information and belief, Shell is the successor in liability to the entity that owned and/or operated

a portion of the property that was formerly the White Star Refinery.

35.     Additionally, Shell owned and operated the South Terminal from approximately

December 1999 to 2003.

36.     To the north and northwest of the Refinery is the property that was formerly the

site of the International Shoe Company tannery (the "Tannery").  Upon information and belief, in

or about 1964, after the closure of the Tannery, Shell purchased the Tannery property and began

operations on it.

37.     In addition to owning pipelines that traverse and are in the vicinity of the

Refinery, Buckeye owns and has owned the portion of the Refinery south of Hawthorne Street

since 2004, which includes various storage tanks and pipelines ("Buckeye Terminal").

38.     Upon information and belief, from approximately 2010 to the present, Marathon

has leased tanks at the Buckeye Terminal.

**C.     INVESTIGATION OF RELEASES AND CONDUCT OF RESPONSE
        ACTIONS TO ADDRESS CONTAMINATION AT THE REFINERY**

39.     From 2003 and continuing at present, Premcor has conducted response actions at

and around the Refinery, under the supervision of and in cooperation with the State of Illinois

Environmental Protection Agency ("IEPA"), as prescribed in a draft administrative order issued

by IEPA "(Draft Order"). These actions have included, but are not limited to, sums expended

toward initial site investigations and assessments, comprehensive characterization of the nature

and extent of contamination at and around the Refinery from past and ongoing releases, and

implementation of actions to eliminate and/or control further releases and address the conditions

created by those releases, including but not limited to those prescribed in Appendix B ("Interim Remedial Measures") and Appendix C ("Site-wide Investigation and Remediation") of the Order. Premcor's site investigation work also has included identifying the location, the type, and the probable sources of the contamination. The Draft Order and its respective Appendices are attached hereto as Exhibit B.

40.     To date, Premcor has spent in excess of $51 million to perform these response actions. In addition, Premcor expects to incur substantial sums to perform additional response actions called for by the Draft Order and/or required by the IEPA.

41.     Premcor's investigation has generally revealed that numerous CERCLA "hazardous substances" have leaked, been disposed of, and/or have otherwise been released from the Refinery, coming to be located in pits, lagoons, other surface areas and soils, at least some of which have migrated into subsurface areas including groundwater. The sources of these contaminants include, but are not limited to, pipelines, pits, lagoons, waste storage and disposal operations, tanks, wastewater collection and treatment units, and refining units owned and operated by the Defendants.

42.     During the periods that Koch, Old Sinclair/BP, and Old Clark/Apex owned and operated the Refinery, the companies discharged, disposed, deposited, dumped, spilled, leaked, placed and/or otherwise released CERCLA hazardous substances, including but not limited to benzene, ethylbenzene, toluene, xylenes (BETX), benzo(a)anthracene, naphthalene, phenanthrene, barium, chromium, lead, mercury, and other contaminants, including but not limited to buried tank bottoms, sludges, and other solid, liquid or semi-solid material resulting from its Refinery operations, into or on the land at the Refinery so that such materials and many constituents

9

thereof entered into the environment or discharged into any waters, including ground waters at the Refinery.

43. During the period that Koch and Old Sinclair/BP owned and/or operated the Refinery, wastes were disposed of at the Refinery by open dumping or burying the wastes in unlined pits or disposing of the wastes in water bodies. This included the disposal and/or release of wastes that are classified as hazardous substances under CERCLA, including but not limited to BETX, benzo(a)anthracene, naphthalene, phenathrene, barium, chromium, lead, mercury, and other contaminants.

44. Upon information and belief, CERCLA hazardous substances, including but not limited to BETX, benzo(a)anthracene, naphthalene, phenathrene, antimony, barium, chromium, lead, mercury, and other contaminants from the Tannery and/or surface impoundments located to the north of the River Dock area and from the Tannery buildings located north and northwest of the north parcel of the Hartford Refinery, were released and/or otherwise disposed of from the Tannery and leached into the ground and groundwater and migrated onto the Refinery, specifically the River Dock area, contributing to contamination at and/or near the Refinery and specifically the River Dock area. These releases, disposal of materials, leaching and/or migration occurred and/or continued while Shell owned the Tannery property.

45. Upon information and belief, the White Star Refinery located north and east of the Refinery was destroyed in a fire, ceasing operations in approximately October 1932. During Shell's ownership of the property that was formerly the White Star Refinery and/or its operations at the site of the former White Star Refinery, releases, disposal of materials, leaching and/or migration of CERCLA hazardous substances, including but not limited to benzene, toluene, ethylbenzene, and xylene ("BTEX compound"), benzo(a)anthracene, naphthalene, phenathrene,

barium, chromium, lead, mercury, and other contaminants occurred and/or continued to migrate, contributing to contamination at and/or near the Refinery.

46.     Upon information and belief, Marathon ceased operations of one or more of its pipelines within the Refinery. When Marathon abandoned and/or took these pipelines out of service, Marathon did not purge, excavate, or remove the lines. These lines remained at the Refinery until Premcor excavated and removed them. The lines were severely corroded, had holes, and caused CERCLA hazardous substances, including but not limited to BTEX compound, benzo(a)anthracene, naphthalene, phenathrene, barium, chromium, lead, mercury, and other contaminants, to leak, leach, and be released into the soil and groundwater.

47.     Upon information and belief, BP/Amoco ceased operations of one or more of its pipelines within the Refinery. When BP/Amoco abandoned and/or took these pipelines out of service, it did not purge, excavate, or remove the lines. These lines remained at the Refinery until Premcor excavated and removed them. These lines were severely corroded, and had holes, and caused CERCLA hazardous substances, including but not limited to BTEX compound, benzo(a)anthracene, naphthalene, phenathrene, barium, chromium, lead, mercury, and other contaminants, to leak, leach, and be released into the soil and groundwater.

48.     In approximately 1979, Apex removed from service a South 10-inch pipeline that runs along north Olive Street from transfer pump house #2 to the south tank farm (now the Buckeye Terminal) (hereinafter "10-inch South Pipeline"). The 10-inch South Pipeline was in poor condition and had numerous leaks and releases. After taking it out of service, but in the same time frame, Apex sold the 10-inch South Pipeline to New Sinclair. From approximately 1979 to 1984, ARCO operated the 10-inch South Pipeline on behalf of New Sinclair to transport products from the Amoco Wood River Refinery through the Refinery to the ARCO Wood River

pipeline station. The pipeline remained in poor condition. Numerous leaks and releases of CERCLA hazardous substances, including but not limited to BTEX compound, benzo(a)anthracene, naphthalene, phenanthrene, barium, chromium, lead, mercury, and other contaminants, occurred and continue to be released into the soil and groundwater.

49.     In approximately 1984, New Sinclair deactivated the 10-inch South Pipeline. New Sinclair did not repair, replace, or remove the 10-inch South Pipeline and left it buried, in place, full of product. In 1990, only half of the expected product was recovered. While the 10-inch South Pipeline was left in the ground, it continued to leak and release CERCLA hazardous substances, including but not limited to BTEX compound, benzo(a)anthracene, naphthalene, phenanthrene, barium, chromium, lead, mercury, and other contaminants, into the soil and groundwater.

50.     Upon information and belief, Buckeye has had multiple leaks and/or releases of CERCLA hazardous substances, including but not limited to BTEX compound, benzo(a)anthracene, naphthalene, phenanthrene, barium, chromium, mercury, and other contaminants, into the soil and groundwater from pipelines and/or tanks. These leaks and/or releases have occurred at the Buckeye Terminal, including a release from Tank 4 in 2005.

51.     Upon information and belief, Marathon had multiple leak(s) and/or release(s) of CERCLA hazardous substances, including but not limited to BTEX compound, benzo(a)anthracene, naphthalene, phenanthrene, barium, chromium, mercury, into the soil and groundwater from pipelines and/or tanks. These leaks and/or releases have occurred at the Buckeye terminal, including a release from Tank 5 in approximately 2013.

52.     As a result of these leaks and/or releases, Premcor has incurred and expects to continue to incur necessary costs of response, consistent with the National Oil and Hazardous

Substances Pollution Contingency Plan ("NCP"), in order to respond to releases or threatened releases of hazardous substance contamination at and around the Refinery; accordingly, Premcor is entitled to recover all such response costs pursuant to 42 U.S.C. § 9607(a).

53.     Premcor's past and future response costs were and/or will be necessary costs of response because they were and/or will be incurred to identify, address, and mitigate the presence of hazardous substances at levels exceeding state water protection standards and otherwise posing a threat to human health and the environment at and around the Refinery, as directed by and with the approval of IEPA.

54.     IEPA has been and will continue to be directly and substantially involved with overseeing and approving Premcor's conduct of response actions under the Order, including but not limited to:

(a)  reviewing and approving numerous site investigation reports and work plans;

(b)  reviewing and approving monthly, quarterly, semi-annual, and/or annual work progress reports; and

(c)  regularly communicating and meeting with Premcor concerning the schedule, scope, and adequacy of response actions.

Accordingly, the costs Premcor has and expects to continue to incur under the Order are and will be in substantial compliance with the National Contingency Plan.

## I.       FIRST CLAIM FOR RELIEF:

### Response Cost Recovery under CERCLA,

### 42 U.S.C. § 9607(a)

(Against all Defendants)

55.     Paragraphs 1 – 54 are incorporated herein by reference.

56.     Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), provides, *inter alia*:

> Notwithstanding any other provision of rule of law, and subject only to the defenses set forth in subsection (b) of this section –
>
> (1)     the owner and operator of a vessel or a facility,
>
> (2)     any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,
>
> (3)     any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, or hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity containing such hazardous substances, and
>
> (4)     any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for --
> …
> (B)     any other necessary costs of response incurred by any other person consistent with the national contingency plan…
> The amounts recoverable in an action under this section shall include interest on the amounts recoverable under subparagraphs [(B)].

57.     Each Defendant is a "person" within the meaning of CERCLA § 101(21), 42 U.S.C. § 9601(21).

58.     Plaintiff is informed and believes, and on that basis alleges, that there have been releases and threatened releases of "hazardous substances", within the meaning of section 101(22) of CERCLA, 42 U.S.C. § 9601(22), by the Defendants at and around the Refinery. Plaintiff is further informed and believes, and on that basis alleges, that the releases or threatened releases are ongoing.

59.     All releases of hazardous substances have occurred at a "facility" within the meaning of CERCLA § 101(9), 42 U.S.C. § 9601(9).

60.    Plaintiff has incurred and will incur necessary costs of response pursuant to CERCLA § 107(a), 42 U.S.C. § 9607(a), consistent with the NCP, 42 U.S.C. § 9607(a)(4), as a result of releases and/or threatened releases (within the meaning of CERCLA § 101(22), 42 U.S.C. § 9601(22)) of hazardous substances at and around the Refinery.

61.    Each of the Defendants is a covered person defined in CERCLA § 107(a)(1), (2), (3), and/or (4), 42 U.S.C. § 9607(a)(1 – 4).  Defendants are therefore jointly and severally liable for all response costs incurred or to be incurred by Plaintiff.

## II.    SECOND CLAIM FOR RELIEF:

## Declaratory Relief Under CERCLA § 113(g)(2) (42 U.S.C. § 9613(g)(2)) and the

## Declaratory Judgment Act (28 U.S.C. § 2201)

(Against all Defendants)

62.    Paragraphs 1 - 61 are incorporated herein by reference.

63.    CERCLA § 113(g)(2), 42 U.S.C. § 9613(g)(2), provides in pertinent part: "In any action described in this subsection the court shall enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages."

64.    The Declaratory Judgment Act, 28 U.S.C. § 2201(a), further states: "In a case of actual controversy within its jurisdiction… any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration."

65.    An actual controversy now exists between Plaintiff and Defendants, and each of them, in that Plaintiff contends that Defendants, and each of them, are parties liable under CERCLA § 107(a), 42 U.S.C. § 9607(a), for all response costs incurred and to be incurred by

Plaintiff in connection with the release or threatened release of hazardous substances at and/or around the Refinery.

66.     Plaintiff seeks a judicial declaration of its rights with respect to the Defendants pursuant to CERCLA § 113(g)(2), 42 U.S.C. § 9613(g)(2), and 28 U.S.C. § 2201, binding the Defendants in any subsequent action or actions to recover further response costs or other damages incurred by Plaintiff, as appropriate and in the interest of justice.

### III.    PRAYER FOR RELIEF:

**WHEREFORE**, Plaintiff prays for judgment against Defendants as follows:

#### FIRST CLAIM FOR RELIEF

For payment of all necessary costs of response, removal and/or remedial action costs, costs of abatement and liability incurred by Plaintiff as a result of any release or threatened release of hazardous substances at and/or around the Refinery.

#### SECOND CLAIM FOR RELIEF

For a declaratory judgment that Defendants are jointly and severally liable for all (or some portion) of any costs, damages and liability Plaintiff may incur as a result of any release or threatened release of hazardous substances at and/or around the Refinery.

#### ON ALL CLAIMS FOR RELIEF

1.     For Plaintiff's costs of suit herein;

2.     For interest on any money judgment;

3.     For Plaintiff's reasonable attorneys' fees; and

4.     For such other and further relief as the Court may deem just and proper.

Dated: July 13, 2017

By:    /s/ James F. Bennett

**DOWD BENNETT LLP**                      **GOLDENBERG, HELLER & ANTOGNOLI P.C.**
James F. Bennett                          Mark C. Goldenberg
jbennett@dowdbennett.com                  mark@ghalaw.com
James E. Crowe, III                       Ann Callis
jcrowe@dowdbennett.com                    acallis@ghalaw.com
John D. Comerford                         2227 South State Route 157
jcomerford@dowdbennett.com                Edwardsville, IL 62025
7733 Forsyth Blvd., Suite 1900            Telephone: (618) 650-7102
St. Louis, MO 63105                       Facsimile: (618) 656-6230
Telephone: (314) 889-7300
Facsimile: (314) 863-2111


*Attorneys for Plaintiff The Premcor Refining Group Inc.*