| | |
|---|---|
| THE PREMCOR REFINING GROUP INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 3:17-cv-738 |
| | ) |
| APEX OIL COMPANY, INC., | ) |
| ATLANTIC RICHFIELD COMPANY, ARCO | ) |
| PIPELINE COMPANY, BP PRODUCTS | ) |
| NORTH AMERICA INC., BP PIPELINES | ) |
| (NORTH AMERICA) INC., | ) |
| KOCH PIPELINE COMPANY, KOCH | ) |
| INDUSTRIES INC., SHELL OIL PRODUCTS | ) |
| US, EQUILON ENTERPRISES, LLC. | ) |
| | ) |
| Defendants. | ) |

# FIRST AMENDED COMPLAINT

NOW COMES Plaintiff, THE PREMCOR REFINING GROUP INC. ("Premcor" or "Plaintiff"), by and through its undersigned attorneys, and for its claims against Defendants APEX OIL COMPANY, INC. ("Apex"), ATLANTIC RICHFIELD COMPANY (also known as "Old Sinclair"), ARCO PIPELINE COMPANY ("ARCO"), BP PRODUCTS NORTH AMERICA, INC., f/k/a Amoco Oil Company, f/k/a Standard Oil of Indiana ("BP/Amoco"), BP PIPELINES (NORTH AMERICA), INC. ("BP Pipelines") (collectively the "BP Entities"), KOCH PIPELINE COMPANY LP, KOCH INDUSTRIES INC. f/k/a Wood River Oil & Refining Co., Inc. (collectively "Koch"), SHELL OIL PRODUCTS US, EQUILON ENTERPRISES, LLC, (collectively "Shell")(collectively "Defendants"), states as follows:

## INTRODUCTION

1. Operations at a new crude oil refinery in Hartford, Illinois ("Refinery") began in 1941. Throughout the history of operations at the Refinery, Defendants have caused and/or

contributed to the release of hazardous substances, contaminants, and/or other regulated toxic substances at and around the Refinery, which hazardous substances have remained at the Refinery as well as migrated off the Refinery property, including to and under the Village of Hartford. Plaintiff, Premcor Refining Group, Inc., at the direction and oversight of the Illinois Environmental Protection Agency ("IEPA"), has undertaken a series of actions to address the release or threatened release of hazardous substances at and around the Refinery and as a result, has incurred and continues to incur costs related to those response actions. Based on the results of investigations, data, analysis, and information compiled by Premcor as detailed herein, each of the Defendants is liable to Premcor under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601-9675 for past and future response costs incurred by Premcor associated with addressing the hazardous substances at and around the Refinery.

2. In a judicially approved settlement agreement with the State of Illinois (the "Consent Order"), attached hereto as Exhibit 1. Premcor resolved its liability under CERCLA for response actions and costs at the Refinery. Premcor has incurred and continues to incur necessary costs of such response actions, in excess of Premcor's fair share of that liability, and therefore has a right of contribution against the Defendants.

## JURISDICTION

3. The Court has jurisdiction over Plaintiff's Claims for Relief pursuant to 28 U.S.C. § 1331 and section 113(b) of CERCLA, 42 U.S.C. § 9613(b).

## VENUE

4. This action involves properties located at or near 201 E. Hawthorne St., Hartford, Illinois, 62048 in the Village of Hartford, Illinois.

5. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C. §§ 9607 & 9613(b) because the Refinery is located within this District and because the acts that give rise to Plaintiff's claims occurred in this District.

## PARTIES

6. Plaintiff, The Premcor Refining Group Inc., is a corporation organized under the laws of the State of Delaware and is qualified to do business in the State of Illinois.

7. Plaintiff is informed and believes, and on that basis alleges, that defendant Apex is a corporation organized under the laws of the State of Missouri and is qualified to do business in the State of Illinois.

8. Plaintiff is informed and believes, and on that basis alleges, that defendant Atlantic Richfield Company ("Old Sinclair") is a corporation organized under the laws of the State of Delaware with its principal place of business in Los Angeles, California, and that defendant ARCO Pipeline is a wholly owned subsidiary of Atlantic Richfield Company.

9. Plaintiff is informed and believes, and on that basis alleges, that defendant BP/Amoco is a corporation organized under the laws of the State of Maryland with its principal place of business in Chicago, Illinois.

10. Plaintiff is informed and believes, and on that basis alleges, that defendant BP Pipelines (North America), Inc., is a corporation organized under the laws of the State of Maine and qualified to do business in the State of Illinois.

11. Plaintiff is informed and believes, and on that basis alleges, that defendant Koch Industries is a corporation organized under the laws of the State of Kansas with its principal place of business in Wichita, Kansas.

12. Plaintiff is informed and believes, and on that basis alleges, that defendant Koch Pipeline is a former corporation organized under the laws of the State of Delaware and qualified to do business in the State of Illinois.

13. Plaintiff is informed and believes, and on that basis alleges, that defendant Shell is a corporation organized under the laws of the State of Delaware and qualified to do business in the State of Illinois.

14. Plaintiff is informed and believes, and on that basis alleges, that defendant Equilon is a corporation organized under the laws of the State of Delaware and qualified to do business in the State of Illinois.

## GENERAL ALLEGATIONS

A. **OVERVIEW OF THE HARTFORD REFINERY**

15. The Refinery is a large, industrial complex that consists, *inter alia,* of numerous buildings, tanks, pits, lagoons and pipelines located on three separate parcels of land that total approximately 400 acres. Two parcels are located on the east side of the Village of Hartford, Illinois and are divided (north and south) by Hawthorne Street. A map of the Refinery and surrounding area is attached hereto as Exhibit 2. The integrated Refinery complex is a single "facility" as defined under CERCLA, 42 U.S.C. § 9601(9).

16. The north parcel covers an area of approximately 205 acres and is covered by aboveground storage tanks ("ASTs") and refinery equipment. The south parcel covers an area of approximately 65 acres and, currently, is covered by ASTs and associated piping and pipelines.

17. The Refinery's third parcel is west of the Village between the United States Army Corps of Engineers flood control levee and the Mississippi River ("River Dock"). This parcel covers approximately 130 acres and was developed with large surface impoundments, landfills,

lagoons, ponds, and/or waste pits into which wastes from Refinery operations were disposed from approximately 1955 to 1987.

18. The integrated Refinery facility includes a barge loading and unloading dock, which connects the River Dock area to other Parts of the Refinery via pipelines. These pipelines run both above and below ground and run from the dock, through the River Dock area, to the levee, and then to and through other portions of the Refinery facility.

**B. OWNERSHIP AND OPERATIONAL HISTORY OF FACILITIES AT OR NEAR THE REFINERY**

    **i. The Refinery**

19. Koch constructed the Refinery in 1940, and owned and/or operated it from 1940 to 1950. Koch also owned and/or operated pipelines that traversed or were in the vicinity of the Refinery after it sold the Refinery.

20. "Old Sinclair," which eventually became Atlantic Richfield Co., bought the Refinery from Koch in 1950. Old Sinclair owned and operated the Refinery until 1967. The BP Entities are the successor in interest and liability to Old Sinclair/Atlantic Richfield Co. Collectively, Atlantic Richfield and its successors will be referred to as "Old Sinclair/BP."

21. On or around September 29, 1967, Old Sinclair sold the Refinery to Clark Oil and Refining Corporation, a Wisconsin corporation ("Old Clark").

22. Apex acquired the Refinery in 1981 when it acquired Clark Oil and Refining Corporation, a Wisconsin corporation ("Clark Wisconsin"), which was the successor to Old Clark, who had owned the Refinery since 1967. Apex is the successor in interest and liability to Clark Wisconsin and Clark Oil & Refining Corporation. Collectively, they will be referred to as "Old Clark/Apex." Old Clark/Apex owned and operated the Refinery from 1967 to 1988.

23. In 1988, Apex sold the Refinery to Premcor as part of its reorganization in bankruptcy. At the time of the sale, Premcor was known as AOC Acquisition Company and thereafter changed its name to Clark Oil & Refining Corporation, a Delaware corporation, and then to Clark Refining and Marketing, Inc., and then to its present name.

### ii. Nearby Pipeline Facilities

24. Numerous pipelines owned and/or operated by defendants Koch, and Shell, and ARCO traverse and are in the vicinity of the Refinery and/or connect the Refinery to nearby properties and/or facilities.

25. Upon information and belief, Koch Pipeline owns and/or operates pipelines that traverse and are in the vicinity of the Refinery from approximately 2006 to the present.

26. Upon information and belief, Shell owned and/or operated pipelines that traverse and are in the vicinity of the Refinery from at least the mid 1940's until at least 2006.

27. Upon information and belief, ARCO operated a pipeline from approximately 1979 to 1984 along Olive Street and that crossed and was adjacent to the Refinery and connected to the BP/Amoco Refinery to the north. The BP Entities are also the entities that owned and operated the BP/Amoco Refinery to the north of the Refinery. Additionally, upon information and belief, the BP Entities are the successor in liability to Standard Oil Company, which also owned and/or operated pipelines that traversed and are in the vicinity of the Refinery.

### iii. Adjacent Facilities Neighboring the Refinery

28. Roxana Petroleum Company constructed a refinery located east/northeast of the Refinery in approximately 1918. In 1928, Roxana changed its name to Shell Petroleum Corporation and in 1939, changed its name to Shell Oil Company, Inc. In 1949 the company

adopted the name Shell Oil Company ("Shell Refinery"). Upon information and belief, Equilon Enterprises became a successor in interest and liability to Shell and the Shell Refinery in 1998.

29. To the north of the Refinery is the property that was once part of the historic operations of the White Star Refinery. In or about September 1936, Shell purchased and began to operate 22 acres of land and all tanks and other personal property located thereon north and east of the refinery ("North Shell Property"), all part of the former White Star Refinery. Upon information and belief, Shell is the successor in liability to the entity that owned and/or operated a portion of the property that was formerly the White Star Refinery.

30. Additionally, Shell owned and operated the South Terminal from approximately December 1999 to 2003.

31. To the north and northwest of the Refinery is the property that was formerly the site of the International Shoe Company tannery (the "Tannery"). Upon information and belief, in or about 1964, after the closure of the Tannery, Shell purchased the Tannery property and began operations on it.

### C. INVESTIGATION OF RELEASES AND CONDUCT OF RESPONSE ACTIONS TO ADDRESS CONTAMINATION AT THE REFINERY

32. As more fully described in the Background Information Document and the Strategic, Tactical, and Operational Plan for Site-Wide Investigation/Remediation Work ("Strategic Plan", attached to the Consent Order as Appendix 4), initial response actions have included, but are not limited to, initial site investigations and assessments, characterization of the nature and extent of contamination at and around the Refinery from releases, and interim actions to address the conditions created or perceivably created by those releases. Premcor's site investigation work also has included identifying the location, the type, and the probable sources of the contamination. Premcor continues to conduct initial response actions at and around the

Refinery under IEPA's direction and oversight. Premcor's initial response actions are necessary to characterize the site and address perceived imminent dangers to human health and the environment at and/or around the Refinery.

33. After these time-sensitive initial response actions were initiated, the Strategic Plan was developed to propose and adopt a final remedy for the site. As prepared by IEPA and entered by the state court on July 26, 2018, the Consent Order, as detailed in the Strategic Plan, governs development of a final remedial action plan designed to achieve a permanent remedy for the site. As detailed therein, the Strategic Plan supersedes and incorporates the interim response outlined in the Draft Order.

34. To date, Premcor has spent in excess of $51 million to perform these initial response actions. Premcor expects to continue to incur substantial sums in performing the response actions pursuant to the Consent Order as detailed in the Background Information Document and Strategic Plan.

35. Premcor's initial response actions and investigation detailed in the Background Information and Strategic Plan documents have generally revealed that numerous CERCLA "hazardous substances" have leaked, been disposed of, and/or have otherwise been released from the Refinery, coming to be located in pits, lagoons, other surface areas and soils, at least some of which have migrated into subsurface areas including groundwater. The sources of these contaminants include, but are not limited to, pipelines, pits, lagoons, waste storage and disposal operations, tanks, wastewater collection and treatment units, and refining units owned and operated by the Defendants.

36. During the periods that Koch, Old Sinclair/BP, and Old Clark/Apex owned and operated the Refinery, the companies discharged, disposed, deposited, dumped, spilled, leaked,

placed and/or otherwise released CERCLA hazardous substances into or on the land at the Refinery so that such materials and many constituents thereof entered into the environment and/or discharged into waters, including ground waters, at the Refinery. As detailed in the Strategic Plan and related appendices, investigation of the contamination showed the presence of varying concentrations of constituents of concern and other CERCLA-listed hazardous substances, including but not limited to those listed in the Skinner List,[1] confirmed through sampling conducted in coordination with IEPA, and detailed in the attached Strategic Plan. Comingled CERCLA contaminants include volatile organic, semi-volatile organic, and inorganic compounds. Contamination includes but is not limited to buried tank bottoms, sludges, and other solid, liquid or semi-solid material.

37. During the period that Koch and Old Sinclair/BP owned and/or operated the Refinery, wastes were disposed of at the Refinery by open dumping or burying the wastes in unlined pits or disposing of the wastes in water bodies. This also included the disposal and/or release of wastes detailed in the Strategic Plan that are classified as hazardous substances under CERCLA.

38. Upon information and belief, CERCLA hazardous substances, including but not limited to those listed in the Skinner List, confirmed through sampling conducted in coordination with IEPA, and detailed in the Strategic Plan, and other contaminants from the Tannery and/or surface impoundments located to the north of the River Dock area and from the Tannery buildings located north and northwest of the north parcel of the Hartford Refinery, were released and/or otherwise disposed of from the Tannery and leached into the ground and groundwater and

---

[1] The Skinner List is a list of CERCLA contaminants commonly found at refinery cleanup sites. This list guided initial investigation and characterization efforts conducted cooperatively with the IEPA. It is referenced in Appendix A to the Draft Order.

migrated onto the Refinery, specifically the River Dock area, contributing to contamination at and/or near the Refinery and specifically the River Dock area. These releases, disposal of materials, leaching and/or migration occurred and/or continued while Shell owned the Tannery property.

39. Upon information and belief, the White Star Refinery located north and east of the Refinery was destroyed in a fire, ceasing operations in approximately October 1932. During Shell's ownership of the property that was formerly the White Star Refinery and/or its operations at the site of the former White Star Refinery, releases, disposal of materials, leaching and/or migration of CERCLA hazardous substances, including but not limited to those listed in the Skinner List, confirmed through sampling conducted in coordination with IEPA, and detailed in the Strategic Plan, occurred and/or continued to migrate, contributing to contamination at and/or near the Refinery.

40. Upon information and belief, BP/Amoco ceased operations of one or more of its pipelines within the Refinery. When BP/Amoco abandoned and/or took these pipelines out of service, it did not purge, excavate, or remove the lines. These lines remained at the Refinery until Premcor excavated and removed them. These lines were severely corroded, and had holes, and caused CERCLA hazardous substances, including but not limited to those listed in the Skinner List, confirmed through sampling conducted in coordination with IEPA, and detailed in the Strategic Plan, and other contaminants, to leak, leach, and be released into the soil and groundwater.

41. In approximately 1979, Apex removed from service a South 10-inch pipeline that runs along north Olive Street from transfer pump house #2 to the south tank farm (hereinafter "10-inch South Pipeline"). The 10-inch South Pipeline was in poor condition and had numerous

leaks and releases. After taking it out of service, but in the same time frame, Apex sold the 10-inch South Pipeline, and from approximately 1979 to 1984, ARCO operated the 10-inch South Pipeline to transport products from its Amoco Wood River Refinery through the Refinery to the ARCO Wood River pipeline station. The pipeline remained in poor condition during ARCO's operations of it. Numerous leaks and releases of CERCLA hazardous substances, including but not limited to those listed in the Skinner List, confirmed through sampling conducted in coordination with IEPA, and detailed in the Strategic Plan, and other contaminants, occurred and continue to be released into the soil and groundwater.

42. In approximately 1984, New Sinclair deactivated the 10-inch South Pipeline. The 10-inch South Pipeline was not repaired, replaced, or removed and remained buried, in place, full of product. In 1990, only half of the expected product was recovered. While the 10-inch South Pipeline was left in the ground, it continued to leak and release CERCLA hazardous substances, including but not limited to those listed in the Skinner List, confirmed through sampling conducted in coordination with IEPA, and detailed in the Strategic Plan, and other contaminants, into the soil and groundwater.

43. As a result of these leaks and/or releases, Premcor has incurred and expects to continue to incur necessary costs of response, at the direction and oversight of IEPA and detailed in the Consent Decree, the Background Information Document and the Strategic Plan, consistent with the National Oil and Hazardous Substances Pollution Contingency Plan ("NCP"), in order to respond to releases or threatened releases of hazardous substance contamination at and around the Refinery; accordingly, Premcor is entitled to recover all such response costs pursuant to 42 U.S.C. § 9607(a). The Strategic Plan is a comprehensive final remedial action plan developed with substantial input and approval of the IEPA, after site investigation, and in accordance with

state and federal guidelines that are protective of human health and environment. The IEPA has found the work detailed in the Consent Decree, Background Information Document, and Strategic Plan to be consistent with the NCP, as detailed in the Strategic Plan and explained in the Consent Order.

44. As detailed in the Consent Decree, and attached Background Information Document and Strategic Plan, Premcor's initial response costs relating to the cleanup and/or removal of hazardous substances are necessary removal costs of response as defined under 42 U.S.C. § 9601(23), as they were incurred and/or continue to be incurred to monitor, assess, and evaluate the release or threat of release of hazardous substances and/or to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release of hazardous substances that were measured at levels exceeding state and federal environmental protection standards and otherwise posing an imminent threat to human health and the environment at and around the Refinery, as directed by and with the approval of IEPA.

45. Other costs detailed in the Consent Decree and its attachments, including Premcor's future response costs, are also necessary costs of response because they are or will be incurred to address the presence of hazardous substances at levels exceeding state and federal environmental protection standards and otherwise posing a threat to human health and the environment at and around the Refinery, as directed by and with the approval of IEPA.

46. IEPA has been and will continue to be directly and substantially involved with overseeing and approving Premcor's conduct of response actions, including but not limited to:

(a) reviewing and approving numerous site investigation reports and work plans;

(b) reviewing and approving monthly, quarterly, semi-annual, and/or annual work progress reports; and

(c) regularly communicating and meeting with Premcor concerning the schedule, scope, and adequacy of response actions; and

(d) implementing the Strategic Plan.

Accordingly, the initial response costs Premcor has incurred, and expects to continue to incur in accordance with the Consent Order and Strategic Plan, are and will be in substantial compliance with the National Contingency Plan.

## I. FIRST CLAIM FOR RELIEF:

## Contribution under CERCLA,

## 42 U.S.C. § 9613(f)(3)(B)

(Against all Defendants)

47. Paragraphs 1 – 46 are incorporated herein by reference.

48. Section 113(f)(3)(B) of CERCLA, 42 U.S.C. § 9613(f)(3)(B), provides, *inter alia:*

> A person who has resolved its liability to the United States or a State for some or all of a response action or for some or all of the costs of such action in an administrative or judicially approved settlement may seek contribution from any person who is not party to [such] a settlement.

49. Plaintiff has entered into a judicially approved settlement with the State of Illinois in excess of its fair share of liability that specifically resolves and expressly intends to resolve CERCLA liability for some or all of a response action and/or the costs of such action.

50. All releases of hazardous substances have occurred at a "facility" within the meaning of CERCLA § 101(9), 42 U.S.C. § 9601(9).

51. All Defendants are "persons" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

52. Plaintiff is informed and believes, and on that basis alleges, that there have been releases and threatened releases of "hazardous substances", within the meaning of section 101(22) of CERCLA, 42 U.S.C. § 9601(22), by the Defendants at and around the Refinery. Defendants are covered persons as defined in CERCLA § 107(a)(1), (2), (3), and/or (4), 42 U.S.C. § 9607(a)(1 – 4).

53. Defendants are thus liable to Plaintiff for contribution pursuant to Section 113(f) of CERCLA, 42 U.S.C. § 9613(f), for all costs in excess of Plaintiff's fair and equitable share of costs that Plaintiff has incurred and may incur for removal and/or remediation of the release and/or threatened release of hazardous substances.

## II. SECOND CLAIM FOR RELIEF:

### Declaratory Relief Under CERCLA § 113(g)(2) (42 U.S.C. § 9613(g)(2)) and the Declaratory Judgment Act (28 U.S.C. § 2201)

(Against all Defendants)

54. Paragraphs 1 - 53 are incorporated herein by reference.

55. CERCLA § 113(g)(2), 42 U.S.C. § 9613(g)(2), provides in pertinent part: "In any action described in this subsection the court shall enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages."

56. The Declaratory Judgment Act, 28 U.S.C. § 2201(a), further states: "In a case of actual controversy within its jurisdiction… any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration."

57. An actual controversy now exists between Plaintiff and Defendants, and each of them, in that Plaintiff contends that Defendants, and each of them, are parties liable under CERCLA § 107(a), 42 U.S.C. § 9607(a), for all response costs incurred and to be incurred by Plaintiff in connection with the release or threatened release of hazardous substances at and/or around the Refinery.

58. Plaintiff seeks a judicial declaration of its rights with respect to the Defendants pursuant to CERCLA § 113(g)(2), 42 U.S.C. § 9613(g)(2), and 28 U.S.C. § 2201, binding the Defendants in any subsequent action or actions to recover further response costs or other damages incurred by Plaintiff, as appropriate and in the interest of justice.

### III.   THIRD CLAIM FOR RELIEF:

### Cost Recovery under CERCLA,

### 42 U.S.C. § 9607(a)

59. Paragraphs 1 - 58 are incorporated herein by reference.

60. Pleading in the alternative, Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), provides, *inter alia*:

> Notwithstanding any other provision of rule of law, and subject only to the defenses set forth in subsection (b) of this section –
>
> (1) the owner and operator of a vessel or a facility,
>
> (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,
>
> (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, or hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity containing such hazardous substances, and
>
> (4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by

such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for --
>   …
>   (B)   any other necessary costs of response incurred by any other person consistent with the national contingency plan…
>   The amounts recoverable in an action under this section shall include interest on the amounts recoverable under subparagraphs [(B)].

61. Each Defendant is a "person" within the meaning of CERCLA § 101(21), 42 U.S.C. § 9601(21).

62. Plaintiff is informed and believes, and on that basis alleges, that there have been releases and threatened releases of "hazardous substances", within the meaning of section 101(22) of CERCLA, 42 U.S.C. § 9601(22), by the Defendants at and around the Refinery. Plaintiff is further informed and believes, and on that basis alleges, that the releases or threatened releases are ongoing.

63. All releases of hazardous substances have occurred at a "facility" within the meaning of CERCLA § 101(9), 42 U.S.C. § 9601(9).

64. Plaintiff has incurred and will incur necessary costs of response pursuant to CERCLA § 107(a), 42 U.S.C. § 9607(a), consistent with the NCP, 42 U.S.C. § 9607(a)(4), as a result of releases and/or threatened releases (within the meaning of CERCLA § 101(22), 42 U.S.C. § 9601(22)) of hazardous substances at and around the Refinery.

65. Each of the Defendants is a covered person defined in CERCLA § 107(a)(1), (2), (3), and/or (4), 42 U.S.C. § 9607(a)(1 – 4). Defendants are therefore jointly and severally liable for all response costs incurred or to be incurred by Plaintiff.

## IV.   PRAYER FOR RELIEF:

**WHEREFORE**, Plaintiff prays for judgment against Defendants as follows:

## FIRST CLAIM FOR RELIEF

Enter a judgment in favor of Plaintiff against Defendants for all costs in excess of Plaintiff's fair and equitable share of response cost and/or response action liability that Plaintiff has incurred and/or will incur in accordance with its settlement with the State of Illinois.

## SECOND CLAIM FOR RELIEF

For a declaratory judgment that Defendants are liable for all (or some portion) of any costs, damages and liability Plaintiff may incur as a result of any release or threatened release of hazardous substances at and/or around the Refinery.

## THIRD CLAIM FOR RELIEF

In the alternative, enter a judgment against Defendants for payment of all necessary costs of response, removal and/or remedial action costs, costs of abatement, and liability incurred by Plaintiff as a result of any release or threatened release of hazardous substances at and/or around the Refinery.

## ON ALL CLAIMS FOR RELIEF

1. For Plaintiff's costs of suit herein;
2. For interest on any money judgment;
3. For Plaintiff's reasonable attorneys' fees; and
4. For such other and further relief as the Court may deem just and proper.

Dated: August 30, 2018

By:    /s/ James F. Bennett

| | |
|---|---|
| **DOWD BENNETT LLP** | **GOLDENBERG, HELLER & ANTOGNOLI P.C.** |
| James F. Bennett | Mark C. Goldenberg |
| jbennett@dowdbennett.com | mark@ghalaw.com |
| Erika M. Anderson | 2227 South State Route 157 |
| eanderson@dowdbennett.com | Edwardsville, IL 62025 |
| Jeffrey R. Hoops | Telephone: (618) 650-7102 |
| jhoops@dowdbennett.com | Facsimile: (618) 656-6230 |
| 7733 Forsyth Blvd., Suite 1900 | |
| St. Louis, MO 63105 | |
| Telephone: (314) 889-7300 | |
| Facsimile: (314) 863-2111 | |

*Attorneys for Plaintiff The Premcor Refining Group Inc.*

CERTIFICATE OF SERVICE

      I hereby certify that on August 30, 2018, the foregoing was filed electronically with the Clerk of Court to be served by operation of the Court's electronic filing system upon all counsel of record.

                                        /s/ James F. Bennett