IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| THE PREMCOR REFINING GROUP INC., <br><br> **Plaintiff,** <br><br> v. <br><br> APEX OIL COMPANY, INC., *et al.*, <br><br> **Defendants.** | Case No. 3:17-CV-738-NJR |

# MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

Pending before the Court is a Motion for Reconsideration filed by Defendant Apex Oil Company, Inc. ("Apex") (Doc. 219). For the reasons set forth below, the Court denies the motion.

This action arises out of claims under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 *et seq.* ("CERCLA"), brought by Premcor against Apex Oil Company, Inc. ("Apex") and seven other defendants. Premcor seeks recovery of costs incurred in remediation activities ordered by the Illinois Environmental Protection Agency ("IEPA") to clean up environmental contamination at a refinery in Hartford, Illinois (Doc. 130, p. 1-2). The plume of environmental contamination arising from the refinery in Hartford and extending under the Village of Hartford has been the subject of a number of federal and state proceedings extending over the past two decades, and Apex has sought to be dismissed from this lawsuit based on a 2016 consent order with the IEPA ("Apex Consent Order")(Doc. 143-1). This Court

initially ruled that Premcor's contribution claim against Apex under Section 113(f) of CERCLA was estopped by the settlement bar in Section 113(f)(2) of CERCLA ("CERCLA Settlement Bar") due to the Apex Consent Order (Doc. 189). Premcor filed a Motion for Reconsideration of that dismissal, and based on its further review of the factual record, this Court concluded in its order of January 15, 2020 ("Reconsideration Order") that because the Apex Consent Order explicitly carved out liability allocated to Apex under earlier federal judicial and administrative orders, the "matters addressed" in the Apex Consent Order were too circumscribed for it to effectively prevent suit under the CERCLA Settlement Bar (Doc. 213). Apex has now filed its own Motion for Reconsideration, arguing that this Court misapprehended the scope of the territories to which the Apex Consent Order and earlier federal orders were to be applied, claiming that the federal orders did not apply to pollution under the refinery itself and that the Apex Consent Order thus should prevent suit under the CERCLA Settlement Bar (Doc. 219).

Having reviewed its Reconsideration Order, the Court is unpersuaded by Apex's arguments. The Court, however, notes that its usage of the term "Hartford Site" in its earlier order may have led to confusion, and it will restate briefly the complex factual and procedural background of this action and revisit the reasoning behind its Reconsideration Order.

### FACTUAL & PROCEDURAL BACKGROUND

As Apex's confusion regarding the Court's Reconsideration Order stems from the usage of the term "Hartford Site," before discussing chronologically the facts and

procedure of this action the Court will first discuss two demarcated territories that are relevant to the action.



*Figure 1: Hartford Village Site (Doc. 219 at 3)*

The territory surrounded by the checked "site boundary" line in Figure 1 will hereafter be referred to by the Court as the "Hartford Village Site." This is the territory that is referred to as the "Hartford Site" in federal administrative orders and in the earlier federal proceeding in this Court before Judge David Herndon.



*Figure 2: Hartford Refinery (Doc. 132 at 132)*

The territory surrounded by red highlighted lines in Figure 2 indicates portions of the land beneath the Hartford Refinery that are addressed in Premcor's current action. The Apex Consent Order as well as Premcor's separate consent order both deal with refinery territory and do not directly deal with abatement efforts within the Hartford Village Site. This territory beneath Premcor's refinery will hereafter be referred to by this Court as the "Hartford Refinery."



*Figure 3: Hydrocarbon Plume (Doc. 219-1 at 91)*

Figure 3 serves to illustrate the extent of some of the hydrocarbon-based contamination in the Hartford area, which arose under the territory of Hartford Refinery and has spread in a plume that has extended beneath the Hartford Site.

*History of Hartford Refinery Contamination and Enforcement Proceedings*

The Hartford Refinery was first constructed in 1940 and has subsequently been expanded and modified extensively and passed between various corporate owners. *See* Order Following Bench Trial, *United States v. Apex Oil Company, Inc.*, No. 05-cv-242-DRH (S.D. Ill. July 28, 2008), ECF No. 199 [hereinafter *Herndon Findings*]. While not all of these changes and transitions in ownership are relevant to consideration of this motion, the Court notes that a corporate predecessor to Apex owned the Hartford Refinery during

the 1980s, while the Hartford Refinery was acquired in 1988 by the company now known as Premcor. *Herndon Findings* at 2–3.

In the late 1970s, reports of gas odors and fires in the Village of Hartford led to an investigation into the causes of these phenomena. *Id.* at 15. Investigations revealed a pool of hydrocarbons beneath the Village of Hartford, and further investigations indicated extensive contamination extending beneath the refinery as well. *Id.* at 19, 30. This hydrocarbon contamination was caused by numerous spills and leaks of petroleum products, as well as subterranean disposal of hydrocarbon wastes, at the Hartford Refinery. *Id.* at 30–32. Once hydrocarbons and associated wastes were spilled on the territory of the Hartford Refinery, they spread beneath the Village of Hartford through groundwater, forming an irregular plume of hazardous substances. *Id.* at 36–37, 40–44.

This plume of contamination is important to keep in mind—the pollution at issue in this action is not solid waste which remains neatly confined in one place. Rather, it is an irregular mix of hydrocarbons and byproducts in liquid and vapor forms, in different densities and viscosities, moving slowly through a variety of geological substrata that extend beneath the area without regard for neat property boundaries. *See id.* at 13 (noting that a hydrocarbon release "will continue its movement in the subsurface), at 29–30 (describing pools of heavier and lighter hydrocarbons within plume), at 37–38 (discussing how changing groundwater patterns affect movement of plume), at 55–58 (discussing findings of hydrocarbon vapors in soil underlying Hartford Refinery and Village of Hartford).

In 2002, a series of severe hydrocarbon vapor intrusion events in the Hartford Village Site attracted the attention of the Illinois Department of Public Health ("IDPH") and the IEPA. *Id.* at 73–78. IEPA and IDPH discovered elevated levels of hexane and benzene in the air, as well as light-range hydrocarbons in the soil. IDPH concluded that hydrocarbon vapor intrusions constituted a public health hazard in the Hartford Village Site and that such intrusions could occur again and create an urgent public health hazard. Because of this perceived health emergency, IEPA asked the United States Environmental Protection Agency ("U.S. EPA") to get involved. *Id.* at 81. U.S. EPA assessed the contamination at the Hartford Village Site and met with five oil companies that U.S. EPA believed to be responsible. *Id.* at 82. That meeting included both Apex and Premcor. *Id.* After lengthy negotiations, U.S. EPA entered an Administrative Order on Consent with Premcor and two other companies on March 17, 2004 ("2004 AOC"). *Id.* at 84. Apex chose not to participate in that agreement. *Id.*

The 2004 AOC was specifically designed to immediately address the public health hazard within the Hartford Village Site, but that document also observed that contamination began with leaks that occurred on the land beneath the refinery and then migrated into a subsurface pool extending beneath the Hartford Village Site. *In the Matter of the Hartford Area Hydrocarbon Plume Site*, Docket R7003-5-05-001, CWA1321-5-04-001 (U.S. EPA) (Doc. 219-1 at 48). The U.S. EPA ordered the parties to the 2004 AOC to take certain measures to monitor and remediate the contamination at the Hartford Village Site, while reserving the right to take further action to "prevent, abate or minimize an actual or threatened release…on, at, or from the Site." *Id.* at 63.

As Apex was not among the parties that voluntarily entered the 2004 AOC, in 2005 the United States commenced a lawsuit in this court against Apex under the Resource Conservation and Recovery Act ("RCRA"). *United States v. Apex Oil Company, Inc.*, No. 05-cv-242-DRH (S.D. Ill.). After discovery and a bench trial, Judge Herndon of this Court issued extensive findings of fact. Herndon noted that immediate measures contemplated for remedying contamination within the Hartford Village Site were initial steps, which would take 15-25 years. *Id.* at 159–61. These initial steps would not remediate contaminated groundwater beneath the Hartford Village Site or Hartford Refinery, but would lay a framework "so that large scale groundwater remediation can begin[.]" *Id.* Herndon again noted that contaminated groundwater would continue to flow from the Hartford Refinery to the Hartford Village Site without steps taken to control migration from the Hartford Refinery Site. *Id.*

Based on his review of the history of hydrocarbon contamination around the Village of Hartford and the Hartford Refinery, Judge Herndon found that Apex had spilled hydrocarbons at the Hartford Refinery and that some of this waste had migrated beneath the Village of Hartford. *Herndon Findings* at 173 ¶ 467. Judge Herndon further noted that some hydrocarbons spilled by Apex remained beneath Hartford Refinery but could in the future migrate beneath the Hartford Village Site. *Id.* at ¶ 468. Judge Herndon found that both the waste currently beneath the Hartford Village Site and the waste remaining beneath the Hartford Refinery could present an imminent and substantial endangerment to the Hartford Village Site. *Id.* at 173 ¶¶ 467–68. Judge Herndon ruled that Apex was "jointly and severally liable for taking such action as may be necessary to

abate the hydrocarbon contamination at the [Hartford Village Site] *and all associated conditions* that present or may present an imminent and substantial endangerment to health or society." *Id.* (emphasis added). In finding Apex jointly liable under RCRA, Judge Herndon noted that the principles governing joint and several liability were the same under government enforcement provisions of other federal environmental laws like CERCLA. *Id.* at 174 ¶ 470.

Based on these findings, Judge Herndon issued an injunction ordering Apex to "investigate the conditions relevant to the potential migration of groundwater contamination from beneath the Hartford Refinery to beneath the Village of Hartford[.]" Order and Terms of Injunction Pursuant to Fed. R. Civ. P. 65(d), *United States v. Apex Oil Company, Inc.*, No. 05-cv-242-DRH (S.D. Ill. July 28, 2008), ECF No. 199-2 at 2 [hereinafter *Herndon Order*]. Judge Herndon further ordered that Apex take:

> "such other action as may be necessary to abate the hydrocarbon contamination at the [Hartford Village Site] *and all associated conditions* that present or may present an imminent and substantial endangerment to health or the environment, pursuant to the terms of any further order of the Court."

*Herndon Order* at 2 (emphasis added).

Lastly, Judge Herndon ordered Apex to "coordinate and cooperate with the parties to the [2004 AOC] in performing activities required under this injunction." *Id.*

The Herndon Order was followed in 2010 by a Unilateral Administrative Order issued by the U.S. EPA ("2010 UAO") in which the U.S. EPA ordered certain cleanup work under the authority granted to it by the Herndon Order and 2004 AOC. *Hartford Area Hydrocarbon Site Unilateral Administrative Order*, RCRA-05-2010-0020, Filing #1 (2010)

(Doc. 219). The 2010 UAO ordered work to be completed solely within the Hartford Village Site but noted that "[n]othing in this Order in any way alters, limits, or otherwise affects the Respondents' continuing obligations under the 2004 AOC and the [Herndon Injunction]." *Id.* at 14–15. In a letter sent to Apex and other parties with the order, the EPA noted that the parties were jointly liable for the cleanup work and that the work would require "continuous cooperation amongst all Respondents[.]" *Id.* at 3. As in the 2004 UAO, the United States retained authority to take any actions "necessary to protect public health or the environment or minimize an actual or threatened release…on at, or from the Site, including but not limited to the right to bring enforcement actions under RCRA and any other applicable statute or regulation." *Id.* at 39.

Separate from the federal actions, the IEPA sued Apex and Premcor in 2013 under the Illinois Environmental Protection Act in the Circuit Court of Madison County, Illinois, for contamination at the Hartford Refinery ("Madison County Proceeding"). That state action culminated in the Apex Consent Order (Doc. 143-1). In the Apex Consent Order, IEPA released Apex from "any and all liability. . .arising under any Environmental Laws relating to each Release of Substances, threatened Release of Substances, and resulting conditions existing at, under, from, on or upon the Refinery" (*Id.* at 14). Environmental Laws as defined in the Apex Consent Order includes "any federal, state or local law…relating to the protection of the environment[,]" a broad yet vague definition that might appear to encompass CERCLA (Doc. 143-1 at 6). The Apex Consent Order further states that it intends to be a good faith settlement pursuant to the Illinois Joint Tortfeasor Contribution Act, and that all claims that could have been brought against Apex by third

parties in the Madison County Proceeding. *Id.* at 16. This release was qualified with certain reservations, including the statement that "[t]his Consent Order does not resolve, settle or in any way alter any liability imposed upon Apex by the [Herndon Order] or by the [2010 UAO]" (*Id.* at 15–16).

The Apex Consent Order was approved by a September 6, 2016 order of the Circuit Court of Madison County, Illinois ("State Court Order") (Doc. 143-2). The Madison County Circuit Court noted that if approved, the Apex Consent Order would "extinguish Apex's liability for contribution for sums ultimately paid by other parties," citing specifically to the Illinois Environmental Protection Act (*Id.* at 2). In its order, the Madison County Circuit Court addressed concerns raised by Premcor that the Apex Consent Order would give Apex a free pass on liability imposed in the Herndon Order and U.S. EPA Order, stating that "this agreement and order does not let Apex 'off the hook' financially for the federal orders" (*Id.* at 5). After reviewing pleadings presented by the parties to the Apex Consent Order and hearing arguments as to the intended scope and meaning of the Apex Consent Order, the Illinois Circuit Court concluded that it "does not affect any liabilities of any parties created by the [U.S. EPA Order]" and that it "does not impair or impinge upon matters addressed and resolved by the [Herndon Order]" (*Id.*). The court dismissed Premcor's motion for summary judgment for contribution costs, noting that as the Apex Consent Order did not affect the Herndon Order or 2010 UAO, any dispute over those orders "would be filed in Federal court where the orders were entered" (*Id.* at 6).

Premcor also settled with the state, agreeing to a consent order with the IEPA in 2018 ("Premcor Consent Order"). The parties to that order indicated that "this Consent Order shall in no way preclude or otherwise impair Premcor's ability to pursue CERCLA claim(s) against the Refinery Defendants[,]" with "Refinery Defendants" defined as including Apex (Doc. 132 at 5, 18). The Premcor Consent Order further states that it does not prejudice Premcor's rights under the Herndon Order and that it is "intended to, and shall serve, as of the Effective Date, as protection from contribution actions or claims as provided by Section 113(f)(2) of CERCLA" (Doc. 132 at 40).

Premcor commenced this action in 2017 under Section 113(f) of CERCLA, seeking contribution for costs incurred in completing the remediation work ordered by the IEPA pursuant to the Premcor Consent Order. As discussed, Apex seeks to be dismissed from the action under the CERCLA Settlement Bar.

## LEGAL STANDARD

Motions for reconsideration are only appropriate where the court has misunderstood a party, made a decision outside of the issues presented by the parties, made an error of apprehension, where a significant change in the law has occurred, or where significant new facts have been discovered. *Broaddus v. Shields*, 665 F.3d 846, 860 (7th Cir. 2011) (citing *Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1191 (7th Cir. 1990)).

DISCUSSION

I.   **Motion to Reconsider**

   a)   *Applicable Law*

The CERCLA Settlement Bar, 42 U.S.C. § 9613(f)(2), provides that a "person who has resolved its liability to the United States or to a State in an administrative or judicially approved settlement shall not be liable for claims for contribution regarding *matters addressed in the settlement*" (emphasis added). The Seventh Circuit has clarified that determination of the matters addressed in the settlement requires a factual inquiry into "the reasonable expectations of the signatories" which involves consideration of factors such as the "particular location, time frame, hazardous substances, and clean-up costs covered by the agreement" though this should not be treated as an exhaustive list of considerations. *Akzo Coatings v. Aigner Corp.*, 30 F.3d 761, 766 (7th Cir. 1994). In considering location, the Court should pay attention to words describing movement of waste from or to the site, which can imply leaching or transportation of waste extending liability beyond any explicit demarcated area discussed in the settlement. *See Rumpke of Indiana v. Cummins Engine Co.*, 107 F.3d 1235, 1238 (7th Cir. 1997). In reading the scope of an order prescribing remediation work, the court should look to the more general response goal, rather than the immediate tasks to be performed. *See, e.g.*, *Allied Corp. v. Frola*, 1993 U.S. Dist. LEXIS 13343 at *21 (D.N.J.).

When in doubt, Courts should not construe settlements broadly, but rather should "require settling parties to be more explicit when they intend to bar contribution[.]" *Akzo Coatings*, 30 F.3d at 768. Certain courts have held that a settlement must make clear in

unambiguous language that it intends to resolve parties' potential CERCLA liability. *W.R. Grace & Co.-Conn. v. Zotos Intern., Inc.*, 559 F.3d 85, 91 (2d Cir. 2009) (text of consent order which made no reference to CERCLA "establishes that the DEC settled only its state law claims"). Where a settlement could be construed to grant immunity only through broad, "limited and ambiguous language[,]" courts have been reluctant to extend the CERCLA Settlement Bar to prevent suit by third parties. *See, e.g.*, *Litgo N.J., Inc. v. Martin*, 2010 U.S. Dist. LEXIS 57390 at *89 (D.N.J.) (finding that language on fully resolving liability was standard form language and refusing to read in release of CERCLA liability); *Cf. DMJ Assocs., LLC v. Capasso*, 2015 U.S. Dist. LEXIS 177460 at *87 (E.D.N.Y.) (discussing settlement where state regulator explicitly stated that party had resolved CERCLA liability for purposes of the CERCLA Settlement Bar).

b) *Discussion*

Apex's Motion for Reconsideration does not indicate that they disagree with this Court's conclusion that all matters addressed by the Herndon Order and 2010 UAO are carved out of the matters addressed by the Apex Consent Order. Rather, Apex argues that those federal orders were confined to the Hartford Village Site and did not touch on the Hartford Refinery at all. Thus, all liability connected with the territory within the Hartford Refinery was within the matters addressed by the Apex Consent Order and is subject to the CERCLA Settlement bar, Apex contends.

This argument is incorrect and stems from an oversimplification of the federal orders. The true scope of those federal orders is best seen in the Herndon Findings. While the immediate effect of the Herndon Order was to require Apex to participate in certain

remediation activities within the Hartford Village Site, the Herndon Findings make clear that these activities were viewed as only an initial step. More broadly, Herndon found Apex to be liable for the pollution at both Hartford Refinery and the Hartford Village Site, cataloging how a long history of spills and poor environmental practices created the extensive plume of hydrocarbon waste extending from beneath the Hartford Refinery to the Hartford Village Site. Remediation at the Hartford Village Site was the first priority because that territory was inhabited, and the hydrocarbon vapors presented a serious and imminent risk to public health. However, Herndon describes the Active LNAPL System, implemented in the Hartford Village Site, as only the beginning of remediation activities. That system, which will be operative for as long as 25 years, will allow groundwater remediation to begin. This subsequent groundwater remediation will necessitate treatment of the portion of the plume under the Hartford Refinery—otherwise, as Herndon notes, the flow of groundwater will simply continue to move more contamination to the Hartford Village Site. Because the waste under the refinery is inextricably linked to the waste under the Hartford Village Site in a shifting, irregular plume that defies the clean boundaries that polluters such as Apex might seek to impose upon it, Judge Herndon correctly noted that the waste under the Hartford Refinery was an "imminent and substantial endangerment" to Hartford Village Site. *Herndon Findings* at 173 ¶¶ 467–68. Based on this language, it seems clear to this Court that when Herndon found Apex liable for abating "the hydrocarbon contamination at the [Hartford Village Site] *and all associated conditions* that present or may present an imminent and substantial endangerment to health or society[,]" (emphasis added) the associated conditions are the

rest of the hydrocarbon plume, including the contamination beneath Hartford Refinery.[1] *See Herndon Order* at 2.

With this in mind, the Court must then determine what to make of the language in the Apex Consent Order purporting to release Apex from any and all liability arising from Hartford Refinery and how to reconcile this with the carve-out of federal liability. While a Court should first attempt to interpret a settlement or consent order based on the plain language of the document, where the language is ambiguous the court will look to extrinsic evidence to assess the intent of the parties and determine their reasonable expectations. *See Alliance to End Repression v. City of Chicago*, 742 F.2d 1007, 1021–22 (7th Cir. 1984) ("consent decrees are construed according to precepts of contract construction"); 17A C.J.S. Contracts § 386 (noting ambiguity permits use of extrinsic evidence of intent). Here, the interplay between the broad release language and the carve-out of federal liability creates ambiguity as to the precise extent of the release.

The language in the Premcor Consent Order explicitly foreseeing a CERCLA contribution claim by Premcor against Apex for costs arising from that order provides some insight into the intent of the IEPA, for it appears that it was not under the impression that it had given Apex complete protection from liability for all matters arising from the contamination at the Hartford Refinery. Indeed, the release language of the Premcor Consent Order is more specific throughout, explicitly mentioning CERCLA

---

[1] The Court notes that Apex has in the past expressed sentiments that are in line with this interpretation, having argued in its appeal from the Herndon Order that it "purports to require Apex to abate any conditions beneath the Refinery that may contribute to oil contamination beneath the Village of Hartford." Doc. 224-1 at 50.

in a number of places and clarifying both that the order will act as a settlement bar under CERCLA and that it will create a cause of action for contribution against defendants that include Apex. The Apex Consent Order, on the other hand, never mentions CERCLA and discusses claims from third parties and settlement in the context of the Illinois Environmental Protection Act and Illinois Joint Tortfeasors Act. Taken together with the Premcor Consent Order, the broad and ambiguous release of the Apex Consent Order looks more like vague boilerplate language, not indicative of an intent by both parties to grant the far-reaching protection that Apex now seeks. As the Seventh Circuit held in *Akzo Coating*, 30 F.3d at 768, the Court will "require settling parties to be more explicit when they intend to bar contribution[.]"

In Apex's motion, it repeatedly equates its consent order to that of Premcor, arguing that the Court's January decision would mean that "both Premcor and Apex would not have obtained any protection from any federal claim related to the Refinery Site" (Doc. 219 at 15–16). Premcor and Apex have different liabilities under the federal orders, and their consent orders are worded differently in a manner that reflects the reasonable expectations of the signatories to those agreements.

First, the Herndon Order and Findings apply only to Apex, while Premcor is only subject to the 2004 AOC and 2010 UAO. Because Premcor voluntarily entered into the 2004 AOC, it was not subject to the federal proceeding resulting in the Herndon Order and Findings, which established that Apex was liable for the entirety of the plume of contamination arising under the Hartford Refinery and spreading under the Hartford Village Site. Rather, Premcor's federal liability solely stems from the two EPA

administrative orders, which are more limited in scope and deal exclusively with specific remediation work to be completed in the Hartford Village Site. Because Premcor's federal liability appears more confined to the Hartford Village Site, it would likely be on firmer ground in seeking a settlement bar based on the Premcor Consent Order. The language of that order reflects this reasonable expectation, as the order states that it is "intended to, and shall serve, as of the Effective Date, as protection from contribution actions or claims as provided by Section 113(f)(2) of CERCLA[.]"

On the other hand, because Apex is subject to federal liability for the Hartford Refinery Site under the Herndon Order & Findings, any consent order that carved out Apex's federal liability would leave Apex vulnerable to suit under that federal order. With this liability in mind, it does not seem that the reasonable expectations of the signatories to the Apex Consent Order could encompass protection under the CERCLA Settlement Bar, as envisioned by *Akzo Coatings*. Apex might be inclined to argue that a state consent order could at least protect Apex from contribution for remediation work ordered by the state, as opposed to the federal government, but the Court is not sure that a state consent order could have even this effect. The work ordered by the U.S. EPA and IEPA is all part of the same general response goal for remediating the totality of the hydrocarbon plume for which Apex is liable. To allow a state settlement to bar suit for contribution for work towards that goal ordered by the state but not the federal government would create a perverse outcome where Apex's liability was contingent on which administrative body happened to order certain remediation work, where Apex's overall liability for remediating the contamination as a whole had already been

established in federal court. It is the view of this Court that such an outcome would amount to a misuse of the CERCLA Settlement Bar.

But the Court need not reach such a holding in this action. Based on its extensive review of the past federal and state proceedings, the factual record describing the scope of hydrocarbon contamination and remediation efforts in the Hartford Village Site and Hartford Refinery, and the Apex and Premcor Consent Orders, the Court concludes that it was not the intent of the IEPA to grant Apex protection under the CERCLA Settlement Bar and that the Apex Consent Order did not accomplish this. Rather, the Apex Consent Order is best read as completely resolving Apex's liability to the State of Illinois but barring suits for contribution solely under the Illinois laws involved in the Madison County Proceeding, not CERCLA.

## CONCLUSION

For the reasons set forth above, the Court **DENIES** Apex's Motion for Reconsideration (Doc. 219).

**IT IS SO ORDERED.**

DATED:   March 13, 2020

_____
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**