**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| THE PREMCOR REFINING GROUP INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:17-cv-738 |
| | ) | |
| APEX OIL COMPANY, INC., *et al.* | ) | Judge Nancy J. Rosenstengel |
| | ) | |
| Defendants. | ) | |

**THE PREMCOR REFINING GROUP INC.'S MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT THEREOF AGAINST ATLANTIC RICHFIELD COMPANY, ARCO PIPELINE COMPANY, BP PRODUCTS <u>NORTH AMERICA, INC., and BP PIPELINES (NORTH AMERICA), INC.</u>**

As a matter of law, Defendants Atlantic Richfield Company ("Atlantic Richfield"), ARCO Pipeline Company ("ARCO"), BP Products North America, Inc. ("BP Products"), and BP Pipelines (North America), Inc. ("BP Pipelines") (collectively, the BP Defendants) are "covered persons" pursuant to the Compensation Environmental Response Compensation and Liability Act ("CERCLA"), as former owners and operators of the Hartford Refinery (the "Refinery") and for abandoned pipelines on Refinery property. *See* 42 U.S.C. § 9607(a)(2). Plaintiff, The Premcor Refining Group Inc. ("Premcor") hereby moves for summary judgment and for the reasons set forth herein, this Court should grant judgment as a matter of law against the BP Defendants on this issue in Phase One.

## I.  Introduction

The BP Defendants operated the Hartford Refinery for decades prior to modern environmental regulations and disposed of hazardous wastes onsite. Tank bottoms, the concentrated oily sludges and solids that built up in the bottom of tanks, were removed and buried on the ground at the Refinery. Sludges built up in traps and separators, were removed, and were disposed of similarly to tank bottoms. Other hazardous substances, including acid sludges, emulsion solids, and spent catalysts, were disposed of in effluent streams, burn pits, and unlined impoundments. In the 1950s and 60s, the years generally at issue in this motion, the Refinery constructed new waste disposal systems, including large, unlined wastewater effluent lagoons designed to settle trapped solids and emulsions into the sediment below and a site-wide surface water system that channeled contaminated Refinery runoff into an onsite impoundment. Pipelines were abandoned in place and left to corrode until hazardous metal-product mixtures seeped into soil. These wastes, and more, are CERCLA hazardous substances and were disposed of onsite. It is undisputed each of the BP Defendants are covered persons as a matter of law.

CERCLA defines covered persons broadly: "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of." *Id.* First, the BP Defendants do not dispute the Refinery is a "facility." Second, it is undisputed each of the BP Defendants are "persons" pursuant to CERCLA. CERCLA defines "Person" to include a "corporation," 42 U.S.C. § 9601(21), and each of the BP Defendants is a corporation within the definition of the statute.

As a matter of law, Atlantic Richfield is liable through corporate merger with Old Sinclair for Old Sinclair's disposal practices during its ownership and operation of the Refinery from 1950-1967. "Corporation" is defined to include predecessor entities, 42 U.S.C. § 5, Atlantic Richfield is the Surviving Corporation in the merger, *Ex. 1,* Plan of Merger at § 1.1, 1.2, which the BP Defendants admit. *Ex. 2,* BP Depo. 158:2-4, 8-9, 159:6-20, 160:10-12. The evidence is undisputed that Old Sinclair disposed of hazardous substances at the Refinery during its ownership and operation of the Refinery. Documents contemporaneous with Old Sinclair's operations, the chemical makeup of the existing contamination at the Refinery, and common industry practices followed by Old Sinclair, demonstrate disposal of hazardous wastes at the Refinery by Old Sinclair. Indeed, the environmental manager for "a division of Atlantic Richfield," admitted in a 1981 filing with the Environmental Protection Agency ("EPA"): "since it was common industry practice to dispose of wastes on plant grounds, the prevailing disposal practice may have been followed. Such wastes may have been considered hazardous . . . [P]ersonal knowledge or recollection of present employees supported this premise." *Ex. 3,* EPA Filing at Prem_Ref 8202. ARCO, BP Products, and BP Pipelines are also each liable as a matter of law because they abandoned pipelines that disposed of hazardous substances at the Refinery.

The BP Defendants cannot create a material issue of fact. Atlantic Richfield is liable

through merger as a matter of law. The BP Defendants produced no documents to rebut evidence of disposal of hazardous substances at the Refinery. They did not retain a single expert witness to rebut Premcor's experts. As a matter of law, this Court must find the BP Defendants are "covered persons" subject to a Phase Two equitable allocation of liability pursuant to CERCLA.

## II.   Background

### A.  The Refinery and Atlantic Richfield's Merger with the Refinery's Owner

In 1950, Sinclair Refining Company ("Old Sinclair") purchased the Refinery and owned and operated the Refinery from approximately 1950 to 1967. *Ex. 4,* 8.2.21 RFA Resp. Nos. 1, 4, 25; *Ex. 5,* 9.04.2008[1] Interrogatory Resp. No. 1, *Ex. 6* Prem_Ref. 449890-449914. Old Sinclair purchased the entire Refinery from Koch. *Ex. 7* State Action BP Depo. 29: 9-11, 19-24. Old Sinclair owned and operated the Refinery until 1967, when it sold the Refinery to Clark Oil and Refining Corporation.[2] *Ex. 6*. Two years after Old Sinclair sold the Refinery, "Old Sinclair merged into Atlantic Richfield Company pursuant to an agreement." *Ex. 4,* 8.2.21 RFA Resp. Nos. 1, 4, 16.

Atlantic Richfield and Old Sinclair merged by a "Plan of Merger" dated November 26, 1968 ("Plan"). *Ex. 1.* Pursuant to the Plan, "Sinclair shall be merged into Atlantic Richfield . . . Atlantic Richfield shall be the Surviving Corporation. The name of the Surviving Corporation shall be Atlantic Richfield Corporation." *Id.* at § 1.1, 1.2. As of the Effective Date:

> the separate existence of Sinclair shall cease and all debts due on whatever account to either of them including subscriptions to shares, other causes of actions, and every other asset belonging to either of

---

[1] As this Court is aware, the BP Defendants were previously third-party defendants in an Illinois contribution action brought by third-party plaintiff, Premcor, in Madison County Circuit Court. When Premcor reached a Consent Order with the Plaintiff, the State of Illinois, as a matter of law, the BP Defendants were dismissed from that case. This motion references certain sworn discovery responses and testimony by the BP Defendants from the "State Action."

[2] Clark Oil and Refining Company is the predecessor to defendant Apex Oil Company ("Apex"). In a stipulation entered July 23, 2021 (Doc. #267), Apex stipulated it is a "'covered person' pursuant to 42 U.S.C. § 9607(a)(2)." A proposed order based on the stipulation has been submitted to the Court.

> them, shall be taken and deemed to be transferred to and vested in
> the Surviving Corporation without further act or deed. The
> Surviving Corporation shall be responsible for all the liabilities and
> obligations of the Constituent Corporations[.]

*Id.* § 3.1. Under the Plan, Atlantic Richfield was responsible for all liabilities and obligations of

Old Sinclair. *Ex. 2,* 2021 BP Depo. 160:17-161:15, 19.

**B. ARCO and BP Pipelines**

ARCO is registered as a d/b/a for BP Pipelines. *Ex. 8,* DOT registration.[3] ARCO is an

affiliate of Atlantic Richfield. *Ex. 2,* BP Corp. Depo. 164:19-165:4, 201:9-12; *Ex. 9,* Village of

Hartford AOC at 4. ARCO operated one 10-inch pipeline that traversed the Refinery from

approximately 1979 to 1984, which was bare steel and had no corrosion protection. *Ex. 10,*

Pipeline Agreement; *Ex. 11,* Hydrostatic Test; *Ex. 7* 138:16-139:6. ARCO was also responsible

for the maintenance of the line. *Ex. 10; Ex. 7* 131:14-20. When pipeline operations ceased,

ARCO neither purged nor removed the pipeline. *Ex. 4,* Nos. 40, 43. Abandoned material left in

the line was not recovered and leaked into the environment through eight identifiable leaks:

> five of which were old leaks that had been improperly clamped off
> and three new corrosion pits. . . . The condition of line dug up [sic]
> was generally poor and pits that were found were very large and
> concentrated. Condition of line is attributed to the fact that the two
> 10" lines are bare and lay but 3" to 5" apart and no active corrosion
> program was carried out on the line.

*Ex. 11*; *Ex. 12,* ARCO Pipe Line Memo. Several of the pits, from which abandoned material

leaked into the environment, were on Refinery property. *Ex. 11.*

**C. BP Products and BP Pipelines**

BP Products was formerly known as The American Oil Company, which became a

---

[3] *See*
https://safer.fmcsa.dot.gov/query.asp?searchtype=ANY&query_type=queryCarrierSnapshot&query_param=USDOT
&query_string=330883, last visited August 8, 2023.

subsidiary of Standard Oil Company (Indiana). ***Ex. 13,*** 9.27.21 Resp. to Interrogatory No. 2.

Stanolind Pipe Line Company ("Stanolind"), an earlier name used by Defendant BP Pipelines,

was an affiliate of Standard Oil Company (Indiana). *Id.; **Ex. 14,*** Maine Corp. Reg.[4] BP Products

and BP Pipelines are both "affiliate companies of the BP family" and affiliates of Atlantic

Richfield. ***Ex. 2,*** BP Corp. Depo. 201:13-21, 202:19-22.

Stanolind owned and operated a 12-inch underground pipeline at the Refinery (the

"Stanolind line") from the 1940's until it was taken out of service in 1968. ***Ex. 15,*** Stanolind

Letter; ***Ex. 16,*** Ref. Scans. In 1979, Amoco Pipeline Company, a name previously used by BP

Pipelines, sold a portion of the Stanolind line to Amoco Oil Company, a name previously used

by BP Products. ***Ex. 2*** 203:9-18; ***Ex. 17,*** Bill of Sale; ***Ex. 18,*** Maryland Corp. Reg; ***Ex. 19,*** Ill.

Entity Profile; ***Ex. 14.***[5] The entity now known as BP Products reopened and operated the

Stanolind line again from 1979 to 1984 in connection with the 10" ARCO pipeline to bring

product to the BP Amoco Refinery, which is north of the Village of Hartford. ***Ex. 20,*** 2018 D.

Lombardi Depo. 245:24-248:3. BP Products abandoned the line in 1984 without purging product

from or removing the line. *Id.; **Ex. 21,*** 2013 S. Mulkey Depo. 311:23-312:3. When excavated,

the line had at least one "large hole" from which abandoned material leaked onto the Refinery.

*Id.* at 312:15.

### D.  Premcor's Experts

Premcor retained four experts. James Watson is a licensed mechanical engineer who has

---

[4]*See* https://apps1.web.maine.gov/nei-sos-icrs/ICRS?CorpSumm=19160002+D, attached hereto as Ex.14 (identifying Stanolind as a former name), last visited August 8, 2023.

[5]*See* https://www.icc.illinois.gov/emdb/ucdb/entity/U2591/filing-list?year=2023, attached hereto as Ex. 19; https://apps1.web.maine.gov/nei-sos-icrs/ICRS?CorpSumm=19160002+D, attached hereto as Ex. 14 (identifying Stanolind Pipe Line Company and Amoco Pipeline Company as former names for this same entity). Both websites last visited August 8, 2023.

worked in the refining industry for more than forty years, including as a maintenance and operations engineer. *Ex. 22,* Watson Rep't, App. A. He has worked as a consultant for two decades at approximately 30 to 40 refineries. *Ex. 23,* Watson Depo. 241:24-242:2. Watson relied on site-specific documents from and about the Refinery and publicly available industry publications to understand the processes used at the Refinery, the wastes generated by those processes, and how the Refinery disposed of those wastes. *Ex. 22* at 14-15; *Ex. 23,* 99:23-111:8, 239:6-10, 240:7-13, 257:19-262:10.

A.J. Gravel is forensic historian for FTI Consulting and has worked in this field for more than 25 years. *Ex. 24,* Gravel Rep't at App. A; *Ex. 25,* Gravel Depo. 22:14-21. He has authored book chapters about environmental forensics. *Ex. 24* at 3. He provided opinions regarding the generation, handling, and disposal of wastes at the Refinery from 1940 to 1967. *Id.*

Mary Sitton is an aerial photography expert and President of Environmental Research, Inc. *Ex. 26,* Sitton Report, App. A. Sitton has more than forty years of experience, including working as a photo analyst for the Environmental Protection Agency ("EPA"), and analyzing aerial photographs at a dozen refineries. *Id.; Ex. 27,* Sitton Depo. 332:21-23. She analyzed aerial photographs of Old Sinclair's operations at the Refinery in 3D. *Ex. 26.*

Dr. Mark Benotti is an environmental chemist at Newfields and holds a doctorate in chemistry. *Ex. 28,* Benotti Report at Exh. B. He has more than 20 years of experience in the field of environmental chemistry, with a specialty in environmental forensics. *Id.; Ex. 29,* Benotti Depo. 22:13-24:21. He analyzed the chemistry of samples taken sitewide at the Refinery and compared the concentrations of metals to known background levels in nearby soils. *Ex. 28* at 7.

The BP Defendants did not disclose any expert opinions, retained or non-retained.

### III.   <u>Standard of Review</u>

Summary judgment is warranted where there are no genuine disputes of material fact, and a party is entitled to judgment as a matter of law. *Diedrich v. Ocwen Loan Servicing, LLC,* 839 F.3d 583, 592 (7th Cir. 2016). *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986) (summary judgment is not an optional remedy within a court's discretion; it must be granted when there are no genuine issues of fact). "The primary purpose for granting a summary judgment motion is to avoid unnecessary trials when there is no genuine issue of material fact in dispute." *In re Ward,* 298 B.R. 869, 872 (S.D. Ill. 2003). When the record as a whole does not lead the trier of fact to find for the non-moving party, summary judgment is warranted. *Id.* Once there is a prima facie showing the moving party is entitled to judgment as a matter of law, a party opposing the motion may not rest upon mere allegations or denials. *Anderson,* 477 U.S. at 248. The response must demonstrate a genuine issue of fact for trial. *Id.* "If evidence opposing summary judgment is merely colorable or is not significantly probative, summary judgment may be granted." *Id.* at 249-50.

### IV.   <u>Argument</u>

#### A.  The Refinery is a "Facility" pursuant to CERCLA.

As relevant here, a "Covered Person" pursuant to CERCLA includes "any person who at the time of a disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of[.]"[6] 42 U.S.C. § 9607(a)(2). Facility is broadly defined under CERCLA to include "any site or area where a hazardous substance has been deposited,

---

[6] The definition of "Covered Person" also includes "(1) owner and operator of a . . . facility; . . . (3) any person who by contract, agreement, or otherwise arranged for disposal, or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person . . . and (4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities . . . from which there is a release, or a threatened release which causes the incurrence of response costs[.]"

stored, disposed of, or placed, or otherwise come to be located." 42 U.S.C. § 9601(9). The

pipelines at issue are also part of the Refinery facility. *See id.* (including "pipelines" in definition

of facility). The BP Defendants admit the Refinery is a Facility. *See* RFA Resp. No. 28. There is

no material issue of fact as to this element, and it is decided as a matter of law.

### B. Atlantic Richfield is a "Covered Person" because of Atlantic Richfield's corporate merger with Old Sinclair and is responsible for Old Sinclair's disposal of hazardous substances at the Refinery.

As a matter of law, Atlantic Richfield is liable for Old Sinclair's ownership and operation

of the Refinery under CERCLA because of Atlantic Richfield's corporate merger with Old

Sinclair. CERCLA defines "person" broadly to include the surviving corporation in a merger.

"Person" includes any "corporation, association . . . [and] commercial entity[.]" 42 U.S.C. §

9601(21). "When Congress defined 'person' by listing a variety of terms that apply to business

entities, it 'intended to include all known forms of business and commercial enterprises.'" *N.*

*Shore Gas Co. v. Salomon, Inc.* 152 F.3d 642, 648 (7th Cir. 1998) (quoting *Anspec Co., Inc. v.*

*Johnson Controls, Inc.,* 922 F.2d 1240, 1247 (2d Cir. 1991)), *overruled on other grounds,*

*Envision Healthcare, Inc. v. PreferredOne Ins. Co.,* 604 F.3d 983 (7th Cir. 2010). "'Company'

or 'association,' when used in reference to a corporation," includes "successors and assigns of

such company or association." 1 U.S.C. § 5. Pursuant to CERCLA, therefore, Atlantic Richfield

and Old Sinclair are the same "company," and the same "person," as a matter of law.

"[T]he drafters of CERCLA were not blind to the universal rule that 'corporation'

includes a successor corporation resulting from a merger and [] the drafters intended

'corporation' to be given its usual meaning." *Anspec,* 922 F.2d at 1245. "In fact, corporate

successor liability is so much part and parcel of corporate doctrine, it could be argued that

Congress would have to explicitly exclude successor corporations if it intended its use of a legal

term of art, 'corporation,' not to include established conceptions of the extent, life span, and path of corporate liabilities." *U.S. v. Mexico Feed & Seed Co., Inc.*, 980 F.2d 478, 486 (8th Cir. 1992). Indeed, the United States Supreme Court has taken this approach when evaluating corporate liabilities in CERCLA. *U.S. v. Bestfoods,* 524 U.S. 51, 63-64 (1998) (finding "[n]othing in CERCLA purports to rewrite this well-settled rule" of corporate law that "a parent corporation may be charged with derivative CERCLA liability for its subsidiary's actions.").

Finding a surviving corporation liable after a merger, moreover, aligns with the Congressional intent of CERCLA by preventing corporations from avoiding liability for environmental harm. "[W]hen Congress wrote 'corporation' in CERCLA it intended to include a successor corporation." *Anspec,* 922 F.2d at 1245. It "did not want to leave a loophole that would enable corporations to die paper deaths, only to rise phoenix-like from the ashes, transformed, but free of their former liabilities." *N. Shore Gas.* 152 F.3d at 648. *See Anspec,* 922 F.2d at 1247 ("Congress would have failed to carry out its purpose of reaching all such entities if successor corporations were exempted from liability"). Nor is there a concern about "punishing the successor for acts (or omissions) of the predecessor; CERCLA is a remedial measure which is aimed only at correcting environmentally dangerous conditions." *Id.* at 649. Holding a successor corporation liable is not unfair; the successor and its shareholders "likely will have derived some benefit from the predecessor's use of the pollutant and the savings that resulted from the hazardous disposal methods." *Id.* at 650. Indeed, courts, including the Seventh Circuit, even impose CERCLA liability for a surviving corporation in *de facto* mergers. *See N. Shore Gas Co.* 152 F.3d at 648.

Accordingly, there is no doubt Atlantic Richfield, the "surviving corporation," is liable for the environmental liabilities of Old Sinclair in an *actual* merger. Plan at ¶ 3.1. *See Anspec,*

922 F.2d at 1246 (citations omitted) (noting in a merger where one corporation ceases to exist and the other continues in existence, "the latter corporation is liable for the debts, contracts and torts of the former, at least to the extent of the property and assets received"); *Smith Land & Imp. Corp. v. Celotex Corp.,* 851 F.2d 86, 91 (3d Cir. 1988) (in merger, liabilities become responsibility of the surviving corporation). BP's Corporate Representative, an attorney who graduated from Harvard Law School and has worked as in-house counsel for BP since 2006, agreed that after the merger, Old Sinclair no longer existed because it merged into Atlantic Richfield. *See Ex. 2* 158:2-4, 8-9, 159:6-20, 160:10-12 (undisputed Atlantic Richfield is the surviving corporation).

Atlantic Richfield assumed liability for *all* liabilities and obligations of Old Sinclair in the Plan. Plan of Merger § 3.1. Such broad assumptions of liability include CERCLA liability, even when entered prior to the passage of CERCLA. *See e.g. Alum. Co. of Am. v. Beazer East, Inc.,* 124 F.3d 551, 566 (3d Cir. 1997) (1954 contract assuming "all of the liabilities and obligations … whatsoever" was clear, unambiguous, and included CERCLA liability even though predated statute's passage); *WisGas LLC v. Am. Nat'l Resources Co.,* 2023 WL 2652079, *6 (E.D. Wis. 2023) (executing liquidation agreement "well before CERCLA's passage" did not preclude it from encompassing CERCLA liability). Failing to apply contractual liability "would be inconsistent with CERCLA's retroactive application and with Congress' intention of assigning CERCLA liability broadly." *Id.* Language such as "any and all" indicates the "intent not to limit the assumption to specific types of liabilities" and to include "future, unknown liabilities." *Id.*

Finally, other Courts have consistently found Atlantic Richfield liable for Old Sinclair's

contamination, including in CERCLA cases under the same merger plan at issue in this case.[7] For example, Atlantic Richfield sought contribution costs from other parties under CERCLA for the cleanup of the "Sinclair Refinery Superfund Site" in New York, which was an oil refinery Sinclair Refining Company ("Old Sinclair") owned and operated from 1919 to 1958. *Atl. Richfield Co. v. Current Controls, Inc.,* 1996 WL 528601, *2 (W.D.N.Y. 1996). Atlantic Richfield "acquired Sinclair through a corporate merger effective March 4, 1969, although [Atlantic Richfield] itself has not conducted refinery operations at the Site." *Id.* There, it was an undisputed fact that "[Atlantic Richfield] is a responsible party under CERCLA" because Atlantic Richfield responded "Admitted" in its response to the Plaintiff's statement: Atlantic Richfield "is responsible for contamination at the Site by virtue of its merger with Sinclair; Sinclair disposed of hazardous substances at the Site from 1924 to 1958." *Id.* at *5.[8]

Atlantic Richfield's admission that it is a "responsible party under CERCLA" for Old Sinclair's liabilities in *Current Controls* is significant. Recently, the Supreme Court held that "potentially responsible party" specifically refers to "covered persons in §107(a)." *Atl. Richfield Co. v. Christian,* 140 S.Ct. 1335, 1353-54 (2022). *Christian* also involved Atlantic Richfield taking on historic liabilities in a corporate acquisition deemed one of the "Decade's Worst Mergers" due to CERCLA's "strict and retroactive liability for the many tons of arsenic and lead that [the acquired entity] had spewed across the area over the previous century." *Id.* at 1347.

---

[7] Premcor cites these cases only to identify cases where Atlantic Richfield was held liable under CERCLA for Old Sinclair's refining operations, not for their holdings, which are not necessarily relevant here.

[8] *See also In re Energy Coop. Inc.,* 173 B.R. 363, (N.D. Ill. 1994) (refinery was owned and operated by Sinclair Refining Company from 1917 to 1968; "Atlantic Richfield Company the corporate successor to Sinclair," became the owner and operator and continued operations until 1976. Atlantic Richfield objected to claims filed by U.S. and Indiana against debtor for response costs at the refinery); *Atlantic Richfield Co. v. Am. Airlines, Inc.,* 98 F.3d 546, 565 (10th Cir. 1996) (Sinclair Refining Company ("Old Sinclair") owned a refinery until 1952, which Atlantic Richfield acquired through the 1969 merger; Atlantic Richfield was identified as a party who generated hazardous wastes at the site).

Atlantic Richfield cannot be a "covered person" when using CERCLA to recover response costs in contribution but avoid the same designation as a defendant here.

Atlantic Richfield even assumed responsibility for contamination allegedly caused by Old Sinclair's refinery operations in the Village of Hartford, the property immediately west of and bordering the Refinery. *Ex. 9* at 1. "Atlantic Richfield" is identified as operating a 10-inch pipeline owned by New Sinclair from 1980 to 1984. *Id.* at 3. "Old Sinclair Corporation" is defined as the "company that merged with Atlantic Richfield Company in 1969[,] and as "own[ing] and operat[ing] what became the former Clark Oil Refinery and the Atlantic/Sinclair pipeline." *Id.* at 3-4. The Vice President, Operations for Atlantic Richfield Company signed the AOC "on behalf of itself and its related companies named herein[.]" *Id.* at 25. Atlantic Richfield cannot now distance itself from this admission related to Old Sinclair's Refinery operations after receiving the benefit of a release from the EPA relating to the Village of Hartford.

### C. Each of the BP Defendants are "covered persons" for the disposal of hazardous substances at the Refinery.

"CERCLA is a broad, remedial statute." *Premium Plastics v. LaSalle Nat. Bank,* 904 F.Supp. 809, 812 (N.D. Ill. 1995). "The remedy that Congress felt it needed in CERCLA is sweeping; *everyone* who is potentially responsible for hazardous-waste contamination may be forced to contribute to the costs of cleanup." *Bestfoods,* 524 U.S. at 56 n.1 (emphasis in original, internal quotation omitted). Thus, Congress created covered person liability for "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of." 42 U.S.C. § 9607(a)(2). CERCLA employs the Solid Waste Disposal Act's comprehensive definition of disposal when defining "covered person." 41 U.S.C. § 9601(29). "Disposal" means:

> the discharge, deposit, injection, dumping, spilling, leaking, or

> placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.

42 U.S.C. § 6903(3).

To prevail on summary judgment, Premcor need only show one hazardous substance was discharged, deposited, injected, dumped, spilled, leaked or placed into the environment during operations for which the BP Defendants are liable. "Environment" means "surface water, groundwater, drinking water supply, land surface or subsurface strata, or ambient air within the United States[.]" 42 U.S.C. § 9601(8). CERCLA broadly defines "hazardous substances" to include "hazardous wastes listed under five other federal environmental statutes, including the Resource Conservation and Recovery Act." *Employers Ins. Of Wausau v. Browner,* 848 F. Supp. 1369, 1373 n.8 (N.D. Ill. 1994) (citing 42 U.S.C. § 9601(14)). "Hazardous substance" does not include "petroleum, including crude oil or any fraction thereof." *Id.*

"It is well known refineries generate hazardous wastes in addition to petroleum products." *Tosco Corp. v. Koch Indus., Inc.,* 216 F.3d 886, 893 (10th Cir. 2000). Even the BP Defendants admitted it "was a valid assumption" a refinery would generate some waste.  State Action Corp. Rep. 108:12-15. These wastes generated by refinery operations include "various hazardous substances and wastes," such as

> slop oil emulsion solids, heat exchanger bundle cleaning sludge, API separator sludge, leaded tanks bottoms, highly corrosive sludges, waste waters, and petroleum hydrocarbon products. Koch operated numerous unlined waste ponds and pits, oil skimming ponds, sumps, settling ponds, cooling ponds, holding ponds, and drainage ditches, and an asphalt pit area and underground pipeline for waste disposal. These areas are probable sources of underground contamination. The pollution caused by the Refinery's various owners and operators commingled and cannot be separated.

*Tosco Corp.,* 216 F.3d at 890. Here, the undisputed evidence demonstrates each of the BP

13

Defendants are a covered person. Each generated, and disposed of, hazardous substances[9] including, but not necessarily limited to:

- Storm water runoff silt contained oily solids and heavy metals.
- Acid treating sludge contained high and low pH materials and phenols.
- Solid wastes, sludges and oily solids from the separator (F037, F038, K048, K051)
- Slop oil emulsion sludge, containing oily solids and heavy metals (K049).
- Crude oil tank bottoms, containing oily solids and heavy metals (K169).
- Non-crude black oil tank bottoms, containing oily solids and heavy metals.
- Leaded gasoline tank bottoms, containing oily solids and heavy metals (K052).
- Spent treating clays, oily solids, and heavy metals.
- FCC catalyst fines, which contain a high concentration of heavy metals.
- Hydrotreating unit catalysts, which would contain metals consistent with K171.

*Ex. 22* at 97, 103-104, 114-115; *Ex. 23,* 184:9-23. *See also Ex. 24* at 36 (disposal of hazardous waste at the Refinery during Old Sinclair's operations included sludges (F037), slop oil emulsion solids (K049), API separator sludges (K051), and leaded tank bottoms (K052).

Documents, testimony by the BP Defendants' corporate representatives, common industry practice, and Premcor's experts' unrefuted analysis points to the undisputed conclusion there were disposals of hazardous substances into the environment at the Refinery for which the BP Defendants are liable as a matter of law. In a 1981 filing with the EPA for the Refinery,[10] Arthur F. Pope, the Manager for Environment Policy and Planning for a "division of Atlantic Richfield Company," admitted that during the operations of Old Sinclair:

> [S]ince it was common industry practice to dispose of wastes on plant grounds, the prevailing practice may have been followed. Such wastes may have been considered hazardous under RCRA regulations. In some instances, personal knowledge or recollection of present employees supported this premise. No records of waste disposal were available.

---

[9] The Court removed the petroleum exclusion from Phase 1, so it was neither relevant to Phase 1 discovery nor to the current dispositive motion. Premcor raises it to note this motion discusses CERCLA hazardous substances, not petroleum, crude oil, or any fraction thereof. *See e.g. Tosco Corp.,* 216 F.3d at 893.

[10] The form was completed for the Refinery. *Ex. 3* at 8194 (address listed matches Refinery's location, "Hawthorne St"); *Ex. 2* 171:22-172:16 (admitting form referenced the Refinery).

*See Ex. 3*. Mr. Pope noted "the probability that some unknown type of wastes were disposed as a consequence of petroleum refining and related activities," some of which may have been hazardous. *Id.* at 8203. The wastes were "Unknown wastes from petroleum refining; and related activities." *Id.* In another filing submitted in 1987 for the Refinery, Mr. Pope and the Illinois Environmental Protection Agency ("IEPA") reported releases into the "Groundwater" and "Surface Water." *Id.* at 8194. They described the "substances possibly present, known, or alleged" as "unknown wastes from Petroleum Refining & Related Activities." *Id.*

These filings submitted on behalf of Atlantic Richfield are consistent with Premcor's refining industry experts' conclusions that the Refinery followed common industry practices and disposed of wastes, including hazardous wastes, into the environment. *See e.g. Ex. 23* 117:16-119:21; *Ex. 24* at 22-23. "Onsite land disposal of these wastes was the industry common practice until environmental regulations targeting hazardous wastes came into effect in the 1970s and 1980s." *Ex. 22* at 115. Direct evidence also demonstrates that, from 1950 to 1967, the Refinery disposed of hazardous substances, including the Refinery's use of unlined acid pits and impoundments, such as the Guard Basin and the river dock Lagoons, and other land disposal of hazardous substances. *Id.; Ex. 23* 289:1-7, 126:22-127:5, 12-18.

In reconstructing refinery operations from nearly 75 years ago, moreover, "CERCLA liability may be inferred from the totality of the circumstances; it need not be proven by direct evidence." *Tosco Corp.,* 216 F.3d at 892. This is particularly true for cases involving older hazardous substances disposal, "as eyewitness testimony or other direct evidence concerning specific waste disposal practices . . . is rarely available." *Id.* "Circumstantial evidence showing disposals of hazardous waste occurred at the [facility] during [a party's] ownership or operation" of the facility is sufficient. *Id.* Here, both direct evidence and circumstantial evidence points to

the undisputed conclusion that, as a matter of law, each of the BP Defendants are liable as "covered persons" for disposal of hazardous substances under CERCLA at the Refinery.

### 1.   Onsite waste disposal included acid pits and acid sludge burning.

Atlantic Richfield is a "covered person" because it is liable for Old Sinclair's onsite disposals of acid sludges, a hazardous substance, at the Refinery. *See Tosco Corp.,* 216 F.3d at 890 (identifying "highly corrosive sludges" as hazardous substances generated by refineries); Watson at 114. The Refinery treated gasoline with sulfuric acid into Old Sinclair's operating years. Watson at 64. Sulfuric acid is a CERCLA-listed hazardous substance. *Ex. 24* at 30, CAS No. 7664-98-9. Treating gasoline with sulfuric acid resulted in acid sludges that "constitute a serious disposal problem." *Ex. 24* at 30. "The disposal of acid sludges was historically considered to be 'one of the most difficult refinery disposal problems,' with refiners using various disposal methods, including burning." *Id.* The Refinery disposed of acid sludges in unlined acid pits and by burning the sludges in a sludge acid burning pit, which was on soil. *Ex. 22* at 101; *Ex. 24* at 22; *Ex. 25* 199:5-16; *Ex. 26,* App. B 1952; *Ex. 30* Scan 016; *Ex. 31* Photo of Acid Pits. The Refinery disposed of at least some acid sludge through burning. *Ex. 23* 281:19-282:2, 253:20-23. Burning caused releases into the surrounding area through the air and disposal of the residual material that did not burn up. *Ex. 25* 175:6-15.

Disposal in the pits was apparent through Sitton's identification of probable oily liquid or material[11] in the acid pits and dark-toned liquid in the acid burning pit. *Ex. 26* at 9, App. B 1952 photo. Sitton concluded the acid pits were unlined because the berms around the pits were "irregular" in shape; if the pit was concrete or had a lining, it would appear more regular. *Ex. 27* 230:12-231:10. *See also id.* 236:17-22 (comparing acid pits to manifold pit, which was lined and

---

[11] Sitton defines "Material" as "raw or waste materials on or in the vicinity of the site." *Ex. 26* at 5.

more "constructed"). Unlined pits allow hazardous substances to leach directly into the

environment. *Ex. 24* at 30.

>    **2.  Onsite waste disposal included the disposal of tank bottoms into tank berms
>         and impoundments.**

Atlantic Richfield is also a "covered person" because it is liable for Old Sinclair's

disposal of tank bottoms, which are hazardous substances that build up as concentrated waste

solids settle to the bottom of tanks. *See Tosco Corp.,* 216 F.3d at 890 (identifying leaded tank

bottoms as hazardous substance); *Cose v. Getty Oil Co.*, 4 F.3d 700, 707-09 (9th Cir. 1993) (tank

bottoms are not within the petroleum exclusion and are "properly viewed as an independent

'hazardous substance' rather than as a component of petroleum"); *U.S. v. Western Processing,*

761 F. Supp. 713, 721 (W.D. Wash. 1991) ("tank bottom sludge is a contaminated waste product,

and not a petroleum fraction"); *Ex. 22* at 97, 114 (including listed waste K052). Tank bottoms

consist of various concentrated hazardous substances, including lead, phenols, sulfurs, metals,

and PAHs. *Id.* at 85, 108. The BP Defendants admitted Old Sinclair used tetraethyllead ("TEL"),

another hazardous substance, which also generated leaded tank bottoms, a listed waste. *Id.* at 80-

81, 85, 108*; Ex. 4* at Resp. Nos. 45, 46. Old Sinclair disposed of its tank bottoms in the tank

berms, demonstrated through staining[12] in the tank berms throughout its operations. *Ex. 26* at 9-

11, App. B Photos 1952-1967. *See Ex. 27* 262:18-25; 332:10-12 (waste disposal activity caused

the staining). The recommended industry practice was to remove the leaded sludges and spread it

on the ground. *Ex. 24* at 23-24.

Tank bottoms must be removed from tanks to clean tanks, repair tanks, inspect tanks, or

change the service of tanks. Watson at 105. During its nearly two decades of operations, Old

---

[12] Sitton defines "Staining" as the "result of cultural activities such as a release, spill, discharge, or dispersed
materials from liquid, solid, or emissions." Sitton at 6.

Sinclair had to remove the sludges that accumulated on the tank bottoms. *Ex. 22* at 84. *See e.g.*
*Ex. 32* Prem_Ref 4396 (cleaning tank 10-8 in 1952 requires removal of tank bottoms). These
substances are hazardous under CERCLA. *See e.g. U.S. v. Western Processing Co.*, 761 F. Supp.
at 721 (petroleum exclusion not applicable to waste oil resulting from rinsing and cleaning oil
tanks). In 1961, for example, during an inspection of tank 120-5, Old Sinclair removed "17
vacuum trucks of emulsion" from the tank. *Ex. 33,* Tank inspection. The Refinery would have
disposed of these wastes through the "lowest cost method," through disposal in either the tank
berm or an unlined impoundment. *Ex. 22* at 85; *Ex. 23* 276:2-9. *See Ex. 25* 144:11-20 ("unless
it's completely different than every other refinery I've ever looked at, [the Hartford Refinery]
would have been burying or burning leaded tank bottoms").

The Refinery also would have followed industry practice of removing wastes when
sumps became full and disposing of those wastes by landfarming, burying, or burning them. *Id.*
146:13-147:16. *See Tosco Corp.,* 216 F.3d at 890 (finding CERCLA liability for operating
sumps for waste disposal). There was no evidence the Refinery did anything else with the wastes
like tank bottoms and sludges. *See e.g. Ex. 25* 322:10-324:14 (no evidence of pads used from
1950 to 1967 for TEL tank bottoms to prevent disposal into the environment because the purpose
was to spread the sludges on the ground so it could be "volatilized and for the liquids to be able
to seep into the ground . . . That's why they call them drying beds").

### 3. Onsite waste disposal included unlined ditches and impoundments, including the unlined River Dock Lagoons and Guard Basin.

Atlantic Richfield is also a "covered person" because it is liable for Old Sinclair's
disposal of Refinery wastes through open ditches and channels into unlined impoundments,
including into the unlined River Dock Lagoons ("Lagoons") and the "Guard Basin." *See Tosco*
*Corp.,* 216 F.3d at 890 (finding Koch liable under CERCLA for operating "numerous unlined

18

waste ponds and pits, oil skimming ponds, . . . settling ponds, . . . and drainage ditches"); Watson at 114. A 1976 EPA report stated it was common industry practice to dispose of wastes through in-ground impoundments. *Ex. 22* at 49; *Ex. 23* 123:9-19 (most common method of disposal of wastes was to put the waste in impoundments or on the ground within the refinery). The impoundments were typically unlined because protecting groundwater from the sludges in these impoundments was not a priority. *Ex. 22* at 50-51.

The BP Defendants admitted Old Sinclair used certain catalysts during its operations. *Ex. 4* at No. 26. Use of catalyst generates spent catalyst waste, which was typically disposed of into unlined impoundments. *Ex. 22* at 69-70; *Ex. 25* 253:10-12, 20-22. In the early 1950's, the Refinery utilized an open ditch, identified as a "waste line & channel," as part of its sewer system to transport Refinery wastes to the Mississippi River. *Ex. 34,* Scan 009; *Ex. 26* at App. B 1952 Photo. In 1951, there was a complaint about Old Sinclair's "obnoxious refinery wastes," including phenol, entering the Mississippi River through the Refinery's outfall sewer. *Ex. 24* at 27-28; *Ex. 35* Letter to Sinclair. Old Sinclair disposed of phenols entrained in the effluent on the Refinery property as it disposed of the effluent into the River. *Ex. 25* 326:9-25. Phenols are a CERCLA listed hazardous substance. *Id.*; CAS No. 108-95-2.

By 1956, Old Sinclair constructed a system of three Lagoons, each eight to ten acres, for its Refinery wastes. *Ex. 36,* Letter from Bi-State Agency; *Ex. 37* 1965 Memo; *Ex. 38,* Waste Assessment; *Ex. 22* at 33. "All refining wastes passed through the lagoons." *Ex. 36*. This was a normal disposal practice at the time: "Lagoons, ponds, sumps and open pits have been used for many decades . . . by the petroleum refining industry for the disposal of liquid and semi-solid waste." *Ex. 22* at 49.[13] Residual oil mixed with wastewater separates from water in the Lagoons.

---

[13] The American Petroleum Industry ("API") also recognized that "dumping and ponding were the dominant disposal methods used. Emulsions that couldn't be separated were usually lagooned or ponded[.]" Watson at 49.

The oil was skimmed from the surface before passing into the second lagoon. The waste solids settled to the bottom of the lagoons. *Id.* at 34; ***Ex. 24*** at 22-23. Wastewater effluent solids that settled into the sediment at the Lagoons are listed hazardous wastes that create CERCLA liability. ***Ex. 22*** at 10.

A historical study of the Refinery's lagoons concluded "the accumulation of oils and toxic metals took place in the lagoons." ***Ex. 38***. By 1960, the Lagoons were contaminated with "probable oily liquid." ***Ex. 26*** at 10, App. B 1960 photo. The "floating oils from the effluent" being disposed of into the Lagoons included waste emulsions, which are hazardous under CERCLA. *See e.g. City of N.Y. v. Exxon Corp.*, 744 F.Supp. 474, 489-490 (S.D.N.Y. 1990) (petroleum exclusion not applicable to waste oil to which CERCLA substances have been added). This disposal of Refinery wastes into the Lagoons continued through and after the time the Refinery was sold in 1967. ***Ex. 22*** at 38.

In 1961, "a spectacular fire producing towering flames" occurred in the Lagoons. ***Exh. 24*** at 34; ***Ex. 39,*** Article. A spark from a leak in a gas line to a barge at the river caused the Lagoons "where various petroleum waste materials and liquids are deposed" to catch fire. *Id. See* ***Ex. 25*** 334:22-335:10 (additional disposal caused by fire's release of hazardous substances into the surrounding environment).

In 1966, the Division of Sanitary Engineering found that "Liquids and hazardous substances are being discharged adjacent" to a municipal solid waste disposal site. ***Ex. 40,*** Memo from Div. of Sanitary Eng. Old Sinclair was identified as the adjacent property owner, and "the refinery is presumably the responsible party for dumping the hazardous oily substance on the ground adjacent to the dump site." *Id.* This dumping area was near the Lagoons and is Refinery property. *Id.*

20

The Guard Basin was another unlined impoundment where Old Sinclair disposed of hazardous substances during its operations. Old Sinclair constructed the Guard Basin in 1956 to handle contaminated runoff water that was channeled to the Guard Basin from across the entire Refinery. *Ex. 41,* 1956 Letter; *Ex. 22* at 94. Although it was intended to handle runoff water, storm water runoff picked up oil and oil coated solids previously released on the ground around tanks, pipes, loading racks, and disposal areas. *Ex. 22* at 38-39. These wastes and solids, which are CERCLA hazardous wastes, accumulated in the low-lying Guard basin and formed into concentrated sludges. *Ex. 41. See U.S. v. Alcan Alum. Corp.,* 964 F.2d 252, 267 (3d Cir. 1992) (oils that become contaminated with hazardous substances through use are subject to CERCLA).

### 4. Onsite waste disposal included the disposal of separator sludges from the main trap.

Atlantic Richfield is also a "covered person" because it is liable for Old Sinclair's disposal of hazardous sludges from the "Main Separator Trap." *See Tosco Corp.,* 216 F.3d at 890 (identifying refinery CERCLA hazardous substances to include "slop oil emulsion solids" and "API separator sludge"); *Ex. 22* at 114. Throughout the 1950's, the Refinery followed industry practice of using the separating process in the "Main Separator Trap." *Ex. 30*; *Ex. 24* at 22. The "main trap" had the same function and purpose as an API separator and was eventually referred to as the API separator. *Ex. 23* 174:19-21, 175:3-19. It separated emulsified materials into solids, water, and hydrocarbon phases. *Id.* 187:22-188:2. Recovered hydrocarbons were reprocessed in the units, the contaminated water was discharged into the sewer system, and the settling solids (refinery separator sludges) were typically disposed of through onsite burial or in an impoundment. *Ex. 22* at 92, 98. The solids that remained in the trap built up over time. Eventually they had to be removed from the trap and disposed of, typically onsite. *Ex. 25* 163:25-164:15 (sediment that builds up in the separator is a listed hazardous waste that "gets

disposed of in the refinery"); 158:10-15; 275:11-14. These wastes are listed hazardous

substances. *Ex. 22* at 114 (listed as F037 and F038); *Tosco Corp.,* 216 F.3d at 890.

> **5.  ARCO, BP Products, and BP Pipelines' abandoned pipelines disposed of hazardous substances into the environment.**

ARCO, BP Products, and BP Pipelines are "covered persons" because they abandoned

pipelines that released hazardous substances into the environment, including commingled

mixtures of abandoned petroleum wastes with corroding and hazardous metals. *Alcan Alum.*

*Corp.,* 964 F.2d at 266-67. It is undisputed ARCO[14] abandoned the 10-inch pipeline it operated

without purging the product from the line or removing the buried line. *Ex. 4* Resp. at Nos. 40,

43. It is undisputed the line was severely corroded and riddled with pits, holes, and improperly

functioning clamps that resulted in releases of the abandoned waste oil into the environment.

*Exs. 11-12*. It is likewise undisputed BP Products and BP Pipelines each abandoned the

Stanolind Line on Refinery property without purging the product from the line or removing the

buried line. *Ex. 20* 247:18-248:3; *Ex. 21* 311:23-312. Though not as corroded as the 10-inch

ARCO line, the Stanolind Line had at least one large hole in it at the Refinery. *Id.*

Because ARCO, BP Products, and BP Pipelines abandoned product in the pipelines they

owned and/or operated, that product became waste. It is no longer part of the refinery process or

processed petroleum, and, therefore, not within the petroleum exclusion. *See Western*

*Processing,* 761 F.Supp. at 721 (substances that are recycled or reused are not hazardous wastes;

if they are not, they are wastes). Over time, hazardous suspended solids settle out of the

abandoned petroleum products, in the same way as solids do in listed wastes, including leaded

tank bottoms. *See id.* at 722 (materials containing substances not added at the refinery, including

rust, lead and PAHs, settled into tank bottoms and were considered wastes). The abandoned

---

[14] As a d/b/a for ARCO, BP Pipelines may also share corporate liability for ARCO.

pipelines themselves, moreover, corroded. Hazardous substances leaked from the abandoned pipeline materials and commingled with hazardous metals from the corroding pipeline itself, rendering the entire mixture hazardous. *Id.* Congress did not intend the petroleum exclusion to shield "releases of oil which ha[ve] become infused with hazardous substances" from CERCLA liability. *Tosco Corp.*, 216 F.3d at 893. *See e.g. Marrero Hernandez v. Esso Standard Oil Co.*, 597 F.Supp.2d 272, 276 (D.P.R. 2009) (releases or threatened releases from corroded tanks outside of the petroleum exclusion); *USOR Site PRP Grp. v. LEI Rone Engineers, Ltd.*, 2017 WL 2840018, at *4 (S.D. Tex. June 29, 2017) (rejecting application of petroleum exclusion where the fuel oil was contaminated with heavy metals). These releases are disposals of hazardous substances pursuant to CERCLA. As a matter of law, therefore, ARCO, BP Products, and BP Pipelines are "covered persons."

### D. Chemical analysis confirms the disposal of hazardous wastes at the Refinery.

Dr. Benotti's chemical analysis of the contamination in the soils at the Refinery concluded CERCLA hazardous substances remain in the environment at the Refinery. *Ex. 28* at 7-8. His analysis concluded background metals in the soil or background levels plus crude or refined petroleum contamination do not explain the levels of concentrated metals in the soils. Rather, these levels are explained by disposal of wastes. *Id., Ex. 29* 304:21-305:7 (describing wastes as those generated from petroleum operations, not recycled, discharged into the environment, and either listed hazardous wastes identified in Watson's report or hazardous based on their characteristics).

Furthermore, hazardous wastes "commingled with the petroleum products in the soil and floating on the groundwater beneath the refinery" are CERCLA wastes and are not subject to the petroleum exclusion. *Tosco Corp.,* 216 F.3d at 893. Accordingly, the chemical makeup of the

contamination at the Refinery further supports a finding of disposal of hazardous substances at the Refinery. The Court should grant summary judgment on the Phase 1 issue and find the BP Defendants are a "covered person" pursuant to CERCLA.

## V.   <u>Conclusion</u>

There are no disputed, material facts regarding the BP Defendants' status as "covered persons" pursuant to CERCLA. The Court must, therefore, grant summary judgment in Phase 1 against the BP Defendants. As a matter of law, Atlantic Richfield is the surviving corporation after the merger with Old Sinclair. Atlantic Richfield assumed all of Old Sinclair's liabilities, including CERCLA liabilities. The undisputed evidence demonstrates there were numerous disposals of hazardous substances into the environment, at the Refinery, during the Refinery's operations from 1950 to 1967, for which Atlantic Richfield assumed all liability. These disposals included (but are not limited to) acid sludges, separator sludges, tank bottoms, spent catalyst, and other refinery wastes, which were buried onsite, burned, or deposited into unlined impoundments like pits, lagoons, and berms.

In addition, ARCO, BP Products, and BP Pipelines are covered persons because they improperly abandoned underground pipelines at the Refinery and left them in place for years, allowing the abandoned product in those pipelines to commingle with hazardous metals in the corroding line, settle, and ultimately release into the environment. These leaks are disposals of hazardous substances under CERCLA.  The Court only needs to find a single disposal of a hazardous substance during the BP Defendants' era of operations to grant summary judgment here. Because the BP Defendants are responsible for multiple disposals of hazardous substances into the environment, the Court should grant Premcor's Motion and find each of the BP Defendants covered persons as a matter of law in Phase One.

Dated: August 9, 2023

Respectfully submitted,

By:    /s/ Erika M. Anderson

**DOWD BENNETT LLP**                      **GOLDENBERG, HELLER & ANTOGNOLI P.C.**
James F. Bennett                            Mark C. Goldenberg
jbennett@dowdbennett.com            mark@ghalaw.com
Erika Anderson                            2227 South State Route 157
eanderson@dowdbennett.com          Edwardsville, IL 62025
Matthew Johnson                         Telephone: (618) 650-7102
mjohnson@dowdbennett.com           Facsimile: (618) 656-6230
7733 Forsyth Blvd., Suite 1900
St. Louis, MO 63105
Telephone: (314) 889-7300
Facsimile: (314) 863-2111

*Attorneys for Plaintiff The Premcor Refining Group Inc.*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that a true and accurate copy of the foregoing was served via the Court's ECF system on the counsel of record on this 9th day of August 2023.

*/s/ Erika M. Anderson*